Debra RAMSEY, Individually and as Next Friend of Ranel Justin Ramsey, a Minor, and Sharron Larsen, as Next Friend of Charity Faye Ramsey, Appellants

v.

LUCKY STORES, INC., d/b/a/ Gemco Stores, Appellee.

No. 01–90–00741–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 18, 1993.
Rehearing Denied April 22, 1993.

David R. Weiner, Leon R. Russell, Dallas, Robert L. Collins, Daniel Kistler, Houston, for appellants.

Judson R. Wood, Marie R. Yeates, Catherine Bukowski, Sloan Shadow, Mike O'Brien, Houston, for appellee.

Before COHEN, MIRABAL and PRICE *, JJ.

## OPINION

PRICE, Justice (Retired).

This is an appeal from a take-nothing judgment based on a jury verdict in a products liability suit involving a lifejacket or personal flotation device (PFD). Appellant Debra Ramsey ("Ramsey"), individually and as next friend of her minor son, Ranel Justin Ramsey, brought suit against Gemco Stores for the death of her husband, Ranel Isaac (Ikey) Ramsey, who died by drowning on March 15, 1981. Appellant Sharron Larsen ("Larsen") intervened in the suit as next friend of Charity Faye Ramsey, daughter of Ikey Ramsey from his previous marriage to Larsen. After a two-week trial involving more than 20 witnesses, the jury returned findings that Gemco sold the PFD; at the time of the sale, Gemco did not fail to give adequate warning of the danger associated with use of the PFD or adequate instructions for safe use of the PFD; and the PFD was not unfit for the ordinary purpose for which it was intended. The jury also found that the negligence of Ikey Ramsey was the cause of his drowning. In answer to all damages issues, the jury found zero damages. The trial court signed a take-nothing judgment on the verdict on May 8, 1990. We affirm.

Appellant Ramsey challenges the judgment in eight points of error; Larsen alleges error in 27 points. Taken together, these points of error claim that the trial court committed reversible error in the following particulars:

The trial court erred in admitting the testimony of Dr. Robert Mecker, Gemco's expert, because Gemco did not sup-

plement Mecker's deposition testimony prior to trial. (Ramsey point 1, Larsen point 23)

The trial court erred in allowing W.W. Roberts, Michael Walker, and W.D. Gilley to testify because Gemco did not include telephone numbers in the information identifying these witnesses. (Ramsey points 2 and 3; Larsen points 24 and 25)

The trial court erred in entering judgment on the jury's answers to questions 2, 3, 4, 5, 6, and 7 because the answers were against the weight of the evidence and were not supported by factually sufficient evidence. (Larsen points 1–12) [1]

The trial court erred in submitting jury question number eight on the deceased's negligence because there was no evidence to support the submission, and the jury's answer to question eight was unsupported by the evidence. (Ramsey points 4, 5; Larsen points 13, 14, 27)

The trial court erred in entering judgment on the jury's answers to questions 10, 11, and 12 because the answers were not supported by the evidence. (Ramsey points 6, 7, 8; Larsen points 15–20)

The trial court erred in overruling appellants' motion for new trial based on improper jury contact by Gemco's counsel and in entering judgment on the jury's answers to questions 10, 11, and 12 because the answers were the result of bias and prejudice resulting from improper jury conduct in its deliberations. (Larsen points 21, 22)

The trial court erred in admitting transcripts and tapes of out-of-court statements allegedly made by Dewey and Tommie Wilson. (Larsen point 26)

Gemco raises one cross-point of error claiming that the appellants' cause of action is preempted by 46 U.S.C. §§ 4301–4311, the Federal Boat Safety Act.

**Factual Background**

Because Larsen challenges the legal and factual sufficiency of the evidence to support all but one of the jury's findings, we

---

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

1. Ramsey challenges only the findings to questions 8, 10, 11 and 12 while Larsen challenges all the findings except the finding to question number one.

state in detail the conflicting evidence adduced at trial.

On the morning of March 15, 1981, Ikey Ramsey and two friends, Dewey and Tommie Wilson, went fishing in Trinity Bay in a 15-foot bass boat that belonged to Ikey Ramsey's father. When they noticed the weather beginning to change, they decided to return to shore. However, when they turned the boat around, its motor stalled. The boat was swamped by its own backwash and quickly sank. As the boat was going down, Ikey Ramsey grabbed a life jacket and put it on with the green side out.[2] The other two men also grabbed flotation devices.[3]

The three began to swim for shore but Ikey Ramsey changed his mind and decided to stay with his father's boat and wait for the others to return with help.[4] It took the Wilsons two hours to swim to shore because the wind was strong and waves were slapping them in the face. When they reached the shore the men went immediately to the closest house, that of W.W. Roberts. Dewey arrived first, very cold and trembling, and Tommie arrived within a few minutes in the same condition. Because of their condition, neither brother could respond to Roberts' questions for 20 minutes or so.

As soon as they were able to tell Roberts what had happened, Tommie Wilson and Roberts went out in Roberts' 14 foot boat to look for Ikey Ramsey. They located the bass boat but could not find Ramsey anywhere. An extensive search by the Coast Guard and other rescue squads was also unsuccessful. Three days later, Ramsey's body was recovered when a crew member on an offshore rig saw it floating in the water. Ramsey was floating face down, arms extended, with one arm partially through one of the armholes of the PFD, which was unzipped and floating along side his body.

The life jacket worn by Ramsey was a Type III personal flotation device that he had purchased from Gemco in 1978. At trial, appellants contended that information was available to Gemco in 1978 regarding certain disadvantages and limitations of the Type III vest, and that it had a duty to warn consumers of those limitations. If the Type III PFD had been equipped with adequate warnings, specifically that it did not have the same visibility, buoyancy, and ability to support an unconscious person's head above water as did a Type I PFD, Ikey Ramsey would have chosen to buy and use the Type I and, according to appellant's expert, would most probably have survived the accident.

The evidence showed that the Ramseys bought the two PFDs for use in canoeing. In making their selection, they considered fit, style, color, and the fact that the device was Coast Guard approved for use on all recreational boats. At the time of the purchase, the Type III PFD carried a label mandated by U.S. Coast Guard regulations and approved by Underwriter Laboratories' standards then in effect that contained the following information:

Flotation Sailing Vest—Reversible
TYPE III—PERSONAL FLOTATION DEVICE
Designed to keep a conscious person in a vertical or
slightly backward position in the water.
Manufactured by
AMERICAN MARINE PRODUCTS, INC.
Hinsdale, Ill,
Chest size 35"–40"
Model No. CG 1000 Lot No. 5
USCG Approval No. 160,064/656/0
Date 3rd QUARTER '76
WARNING! DO NOT DRY CLEAN

Approved for use on uninspected commercial vessels less than 40 feet in

2. The jacket was green on one side and yellow on the other, rather than the more highly visible international orange.

3. Tommie Wilson wore a second lifejacket identical to Ramsey's that was purchased by the Ramseys at the same time as the one Ikey Ramsey put on. Dewey Wilson grabbed a seat cushion.

4. At trial, considerable controversy arose over Ramsey's motives in staying with the boat. According to appellants, Gemco suggested to the jury that the decision was motivated by money and was "dumb." In contrast, appellants pointed out that the first rule of boating safety is to "stay with the boat."

length not carrying passengers for hire and all recreational boats by persons weighing more than 90 pounds.

> This garment is
> not recommended
> for water skiing.
> Warranty void if
> used for this purpose.

Appellant's experts testified that a Type III PFD is designed to provide a stable face-up position in calm water for a conscious wearer; that it is good only for calm, inland waters, or waters where there is a good chance for fast rescue; that it will not hold the face of an unconscious wearer clear of the water; and that in rough water the wearer's face may often be covered by waves. A Type III PFD is not to be used for extended survival in rough water.[5] However, the Type III PFD was appropriate for canoeing, the activity for which the Ramseys purchased it. A Type I vest is not appropriate for canoeing.

Gemco argued that the vest in question complied with all Coast Guard regulations and UL standards in effect at the time of its sale and purchase and that Gemco, as seller, had no control over the contents of the label. An agent of the manufacturer, who was non suited, testified that in one instance he attempted to add instructions to a PFD label, but UL refused the additional instructions on grounds that additional language would be confusing to the consumer.

Nevertheless, according to appellants' experts, the label, regardless of technical compliance in 1978, failed to provide any warnings or instructions to the consumer concerning safe use of or the dangers associated with use of the Type III PFD. Although the same expert admitted on cross-examination that he did not formulate his present opinions and conclusions regarding the limitations of the Type III device until

August of 1979, appellants presented evidence that, in 1978, at least one manufacturer of PFDs was including this additional information with its products in pamphlet form. Later Coast Guard-required warnings accompanying such PFDs do, in fact, carry warnings and statements of limitation of use.

Gemco presented evidence that most recreational boaters will not wear a Type I vest because it is very bulky and uncomfortable. The Coast Guard endorsed Type III PFDs partly because their comfort made it more likely that consumers would actually wear them. According to the Coast Guard, the Type III PFD has saved lives that would otherwise have been lost if it had not been introduced at all. Gemco also elicited testimony that the Coast Guard had labelled the public information efforts of one of appellants' experts "potentially dangerous" because he emphasized the limitations of Type III PFDs. The Coast Guard feared that persons reading the limitations would become mistrustful of all PFDs and wear no device at all.

Perhaps the most significant factual dispute concerned whether Ikey Ramsey was conscious when he drowned. Appellants insisted that he was and that the greater buoyancy of the Type I PFD would have allowed him to maintain his head above water long enough for the initial rescuers to have reached him, even if the bay waters were rough and the temperature was as cold as Gemco claimed. Gemco theorized that Ramsey had succumbed to hypothermia, become unconscious, and then drowned. If Ramsey lost consciousness before he drowned, then, according to Gemco's expert, given the fact that the bay waters were rough, the protection offered by a Type I vest would not have been significantly better than that offered by the Type III.[6]

---

**5.** In contrast, both experts testified that a Type I PFD performs better in both rough and calm waters. It provides greater buoyancy than the Type III and will hold an unconscious person's head out of the water.

**6.** Appellant Ramsey concedes that "a finding that [Ramsey] was unconscious when he

drowned tends to support appellee's claim that the deceased would have died regardless of how much buoyancy was provided by a PFD, since drowning would follow within minutes of losing consciousness because of the inability to struggle against the effects of the waves."

Relevant to the hypothermia theory, the parties presented conflicting evidence indicating that the range of water temperature in Trinity Bay was between 50–62 degrees. Most particularly, the appellants presented a Coast Guard report and a water fatality report that recited a water temperature of 62 degrees. Gemco contended that the reports were for the day the body was found, three days after the accident, and presented instead the Baytown Sun newspaper, which reported a water temperature of 56 degrees on the date of the accident.[7] Experts testified at trial that in water within this temperature range, Ramsey could have survived only about one to two and one-half hours.[8]

Likewise, there were disputes about the extent of "chop" in the bay. The Baytown Sun on March 15 reported the bay was choppy with wave heights of three to five feet. The Wilsons testified that the waves were one to two feet, however, several years prior to trial they told an investigator that wave height was two to three feet. Other witnesses testified to wave heights ranging from two to four feet. The Coast Guard and water fatality reports indicated that bay waters were "rough."

**Error in the admission of Dr. Mecker's testimony**

The trial court erred in admitting the testimony of Dr. Robert Mecker, Gemco's expert, because Gemco did not supplement Mecker's deposition testimony prior to trial. (Ramsey point 1, Larsen point 23)

Dr. Joseph Jachimczyk, medical examiner for Harris County, performed the autopsy on the decedent. In reaching his conclusion that the deceased was conscious at the time he drowned, Jachimczyk testified specifically that he relied on his finding of hemorrhaging in the decedent's middle ear. The hemorrhaging occurs in drowning as a result of the stress and strain of trying to breathe when there is insufficient oxygen.

Appellants contend that, when asked in his deposition whether he agreed with Jachimczyk's theory, Mecker testified that he could not give a definitive answer because he needed to do further research. According to appellants, Mecker changed his testimony at trial and contradicted Jachimczyk's theory to their surprise and prejudice, stating "for the first time on the witness stand" his opinion that the decedent died of hypothermia. Because Mecker did not supplement his deposition testimony with this allegedly new answer, appellants claim his testimony should have been excluded.

A review of the record reveals that in deposition Mecker stated that he had some questions about the correctness of some of Dr. Jachimczyk's statements, including the statements about the blood in the middle ear. Jachimczyk had said that finding indicated Ramsey was conscious when he drowned. When asked whether he disagreed, Mecker said he could not give "a definitive answer right now." He explained that he had considered the literature on the pathology of blood in the middle ear as it relates to drowning. He acknowledged that the finding was consistent with drowning but *stated that the pathology chapters he had reviewed did not characterize it as indicative of consciousness or unconsciousness.* At other times during the deposition, Mecker stated that "As the confusion deepens, eventually the person will lose consciousness and ... most likely they would have drowned," "although the possibility is there that [Ramsey] may have survived three hours ... the chance of him staying awake that long or conscious is extremely remote," and "hypothermia played a direct role in [Ramsey's] death."

In addition, in supplemental interrogatory answers filed more than one year before trial, Gemco stated that Mecker was experienced with patients suffering from hypothermia and would testify that "plaintiff probably lost coordination of his extremi-

---

7. Although appellants state that the newspaper was not properly authenticated, they have not raised this argument as a point of error on appeal.

8. In his deposition, Mecker testified that at the longest, Ramsey might have survived three hours, presumably at the higher water temperature.

ties and then lost consciousness within two or two and one-half hours of the time [he] went into the water. Further that Plaintiff probably died within about two and one-half hours from the time the boat sank." Thus we conclude that appellants had timely notice of Mecker's hypothermia theory.

At trial, Mecker testified consistent with Gemco's interrogatory answers and his own deposition testimony that

> The studies that have looked at drowning victims have sought some kind of evidence or finding that they can use to say, yes, this was a drowning, or, no, it was not a drowning because sometimes it can mimic other causes of death.

> That (sic) is nothing in the literature that supports it [blood in the middle ear] being related to consciousness or unconsciousness. It is only found to be consistent with drowning.

The duty to supplement discovery answers arises when (1) the party knows that the response was incorrect or incomplete when made, or (2) the response, though correct and complete when made, is no longer true and complete, and the circumstances are such that failure to amend the answer is in substance misleading. TEX.

R.CIV.P. 166b(6)(a). Appellants contend that this duty extends to deposition testimony, while Gemco argues that it does not.[9] We need not reach this question, however. Dr. Mecker's opinion that Ramsey died of hypothermia-induced drowning was stated in his deposition and did not change; therefore, no duty to supplement arose. There was no error in the admission of Dr. Mecker's testimony. We overrule Ramsey point of error one and Larsen point of error 23.[10]

### Error in the admission of testimony of W.W. Roberts, Michael Walker, and W.D. Gilley

> The trial court erred in allowing W.W. Roberts, Michael Walker, and W.D. Gilley to testify because Gemco did not include the witnesses' telephone numbers in the information identifying these witnesses. (Ramsey points 2, 3; Larsen points 24, 25)

W.W. Roberts' residence is located on Trinity Bay. It was his home to which the Wilson brothers went when they reached shore. Roberts took Tommie Wilson back out in his boat to look for Ramsey. Lending credence to the evidence that the bay

---

**9.** Appellants cite *Foster v. Cunningham,* 825 S.W.2d 806 (Tex.App.—Fort Worth 1992, writ denied), claiming that it imposes a general duty on a deponent to supplement his deposition testimony. We do not agree that *Foster* stands for this principle. In *Foster,* appellant's attorney had issued a deposition notice that included a subpoena duces tecum requesting documents giving the names and addresses of potential witnesses. When the deponent did not provide the documents at the deposition, the attorney then orally requested information that would enable him to locate a particular witness:

> Foster's attorney: "What I'm really interested in also is how to locate them or visit with them."
> Deposition witness: "Oh, okay. I don't mind." ...
> Cunningham's attorney: "If we have got them we'll provide them to you."

After the deposition, Cunningham gave Foster the name, address and telephone number of the witness in question but Foster's attorney was unable to locate her at that address. Five days before trial Cunningham's attorney located the witness and told Foster's attorney that he was going to call her, but he did not inform Foster's attorney of the witness' new address. At trial, Foster sought to exclude the testimony of the

witness because of Cunningham's failure to supplement. The court of appeals held that use of a deposition to make a discovery request that could also have been made through interrogatories was proper. Once a proper discovery request is made, the requesting party has no burden to request supplementation. Further, once Cunningham provided the witness' name and location, he then had a duty to supplement when he became aware that the information was no longer true and correct.

In the instant case, no similar request was made during Dr. Mecker's deposition. And, because the issue is not before us, we decline to consider whether such a specific request would trigger an automatic duty to supplement. We do note in general that any witness who testifies at trial differently from his deposition is subject to impeachment with the deposition testimony.

**10.** We also note that Dr. Jachimczyk, appellants' medical expert, agreed that his autopsy findings, including but not limited to the blood in the middle ear, were consistent with victims who were conscious as well as with victims who were unconscious at the time of their drowning. Thus we fail to see how the appellants could show harm, even if there were some discrepancy in the trial and deposition testimony.

waters were cold and choppy on the day of the accident, Roberts testified that both the Wilsons were cold and trembling when they arrived at his house and could not speak for 20 minutes. He also stated that based on his experience, he would not have gone out in a bass boat on that day.[11] Walker was a state game warden who participated in the rescue effort. He also testified that he would not use a bass boat like Ramsey's to go fishing in Trinity Bay in the winter.[12] W.D. Gilley was the worker on the offshore rig who spotted Ramsey's body in the water. He explained that he made the discovery when he saw the lifejacket floating on the water and investigated it.

■ Appellants contend that the testimony of these witnesses was offered for the purpose of suggesting that Ramsey was negligent, and that it had the cumulative effect of misleading and confusing the jury. However, the appellants' objections at trial, and the points of error based thereon, are global and seek exclusion of the witnesses' testimony in its entirety based on Gemco's failure to provide telephone numbers. Appellants do not claim that they could not locate the witnesses with the information provided, which included complete and correct addresses. The appellants cite no objections to specific portions of the testimony on grounds of relevancy, confusion, or unfair prejudice.[13] Therefore, the only question for this Court is whether failure to supply a telephone number in the identification of persons with knowledge of relevant facts mandates exclusion of those persons' testimony. We hold that it does not.

Appellants concede that no decision has applied the sanction of automatic exclusion when a party has failed to disclose a witness' telephone number. However, they argue that the sanction, applied consistently in cases where an address is not given or supplemented, should apply. Tex.R.Civ.P. 166b(6)(a). Rule 166b(2)(d) states that "a party may obtain discovery of the identity and location (name, address and telephone number) of any potential [witness]," and failure to supplement answers to interrogatories with a current address has been held grounds for imposing the sanction. *Boothe v. Hausler*, 766 S.W.2d 788, 789 (Tex.1989); *Clark v. Trailways, Inc.*, 774 S.W.2d 644, 645–46 (Tex.1989); *see also Morrow v. H.E.B., Inc.*, 714 S.W.2d 297–98 (Tex.1986).

The purpose of rule 166b(2)(d) is to make discoverable the identity and location of potential witnesses. Tex.R.Civ.P. 166b(2)(d). The rule suggests that there are two components of location, addresses and telephone numbers, that may, upon request, be discovered under the rule. However, only an address actually reveals the *location* of the witness; a telephone number does not disclose whereabouts but merely provides a convenient method of contacting the witness, wherever he may be. Therefore, the omission of an address may make location of the witness impossible, even if a telephone number is given, but omission of a telephone number when a correct address is supplied does not impede the party who wishes to locate the witness.

While no Texas court has addressed this precise issue, the supreme court's perspective in *Boothe*, 766 S.W.2d at 789, seems to confirm the relative insignificance of telephone numbers. A review of the court of appeals opinion in *Boothe* indicates that the offending party had failed to supplement his interrogatory answers with the witness's correct address *and telephone number*. *Boothe v. Hausler*, 762 S.W.2d 304, 305 (Tex.App.—Houston [1st Dist.] 1988), *rev'd*, 766 S.W.2d 788 (Tex.1989). In its opinion, the supreme court reaffirmed the

---

**11.** Roberts' deposition was taken more than a year before trial.

**12.** We note that Ramsey also listed Walker as a person with knowledge of relevant facts in her discovery responses, but, like Gemco, failed to provide a phone number. Walker's deposition was taken more than a year before trial as well. His telephone number appeared on the Water

Fatality Report he had authored that was attached as an exhibit to the deposition.

**13.** Further, appellants agree that the court's charge instructed the jury that, in considering whether the negligence of Ramsey caused the occurrence in question, it was not to consider the conduct of Ramsey prior to the point when he put on the PFD.

principle that the automatic sanction of exclusion is appropriate when the responding party does not supply a witness's *address* in response to a proper discovery request. However, the supreme court completely ignores and never mentions the party's failure to provide a telephone number.

We hold that when, as here, the location of a potential witness is fully and correctly disclosed by supplying a current address in timely response to a proper discovery request, the purpose of the rule has been served. Sanctions in the form or exclusion of the testimony for failure to supply a telephone number under these circumstances are not warranted. We overrule Ramsey points of error two and three and Larsen points of error 24 and 25.

**The sufficiency of the evidence**

The trial court erred in entering judgment on the jury's answers to questions 2, 3, 4, 5, 6, and 7 because the answers were against the weight of the evidence and were not supported by factually sufficient evidence. (Larsen points 1–12)

In answering question number two in the negative, the jury determined that Gemco did not fail to warn or to give adequate instructions in connection with the sale of the PFD. Because of this determination, they did not answer questions three and four, which were conditioned on an affirmative answer to number two. In their answer to question five, the jury said that plaintiffs did not give Gemco any notice of a breach of warranty claim before filing suit.[14] Question six, to which the jury also responded in the negative, asked whether the PFD was unfit for the ordinary purpose for which it was intended. The jury did not answer question seven, which was predicated on an affirmative answer to question six. Therefore, the question on appeal is whether there was legally and factually sufficient evidence to support the jury's findings that (1) Gemco did not fail to warn or instruct the purchaser in connection with its sale of the PFD in August 1978, and (2) the PFD was not unfit for the ordinary purpose for which it was intended.

■ When the party with the burden of proof challenges the legal sufficiency of the evidence to support the jury's failure to find in his favor, he must show that no evidence supports the failure to find and the evidence establishes the desired finding as a matter of law. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 648–50 (Tex.1988); *Ritchey v. Crawford*, 734 S.W.2d 85, 86 (Tex.App.—Houston [1st Dist.] 1987, no writ). A challenge to the factual sufficiency requires the party with the burden of proof to establish that the non finding is so contrary to the great weight of the evidence as to be manifestly unjust. *Cropper*, 754 S.W.2d at 649. In resolving a no evidence challenge in this context, we consider only the evidence that tends to support the failure to find. If there is no evidence to support the failure to find, we then examine the record to determine whether it establishes the contrary as a matter of law. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989); *Holley v. Watts*, 629 S.W.2d 694, 696–97 (Tex.1982). A factual insufficiency point requires us to consider all the evidence, both in support of and contrary to the finding. *Sterner*, 767 S.W.2d at 690.

■ Our factual statement, set out earlier in this opinion, clearly indicates that the jury heard extensive conflicting evidence regarding the fitness of the PFD as well as the sufficiency of the warnings and instructions that accompanied it. In support of the negative findings, the jury heard evidence that the PFD in question was purchased for use in canoeing, an activity for which its use was intended. The jury also heard expert testimony from both sides that Ikey Ramsey may have succumbed to hypothermia and that, in that case, his reliance on the Type III PFD most likely did not cause his death. There was uncontradicted testimony that Gemco had no option to vary the label required by the

---

14. On the issue of notice of a breach of warranty claim, Larsen merely states, "Defendant offered no evidence on the point, and even if defendant had, it would be irrelevant, since Intervenor did not submit an issue on breach of warranty." For these same reasons, we fail to see the basis for harm to Larsen or for any other complaint on appeal.

Coast Guard. The PFD met all U.S. Coast Guard and Underwriters Laboratory standards, including labeling requirements, in effect at the time of its sale. The jury heard further testimony and argument that Gemco was not in a position to know if any additional wording should have been required in 1978 when the appellants' expert stated that he did not reach that conclusion until at least 1979.

■ The jury determines the credibility of the witnesses and the weight to be given their testimony, and we may not substitute our view of the evidence for that of the jury. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 796–97 (1951). Appellants did not meet their burden on appeal to establish that the evidence mandated a finding in their favor. Nor have they shown that the failure to find was against the overwhelming weight of the evidence. Accordingly, we hold that the evidence was sufficient to support the jury's answers to questions two, three, four, five, six, and seven, and overrule Larsen points one through 12.

### The decedent's negligence

The trial court erred in submitting jury question number eight on the deceased's negligence because there was no evidence to support the submission, and the jury's answer to question eight was unsupported by the evidence. (Ramsey points 4, 5; Larsen points 13, 14, 27)

■ The trial court submitted the following question and instruction to the jury:

Did the negligence of Ranel Isaac Ramsey proximately cause the occurrence in question?

You are further instructed that you are not to consider the conduct of Ikey Ramsey prior to the point when he put on the personal flotation device.

Larsen objected to the submission on grounds that there was no evidence to support it.[15] On appeal, the appellants argue that Ramsey's decision to stay with the boat was in keeping with all principles of water safety. Even Gemco's experts agreed that Ramsey "behaved in textbook fashion" by staying with the boat. However, while the appellants contend that there was nothing about Ramsey's putting on the PFD or staying with the boat that even remotely suggested an awareness of the danger associated with the PFD, Gemco points to other considerations that tend to support the jury's finding that Ramsey was negligent.

Specifically, Gemco cites the following evidence that tends to support the jury's finding:

Appellants' safety expert prefaced his answer about the instruction to stay with the boat with a presumption that the individual is not near enough to the shore to make it to land.

The boat was about 200 yards from shore.

Both of the decedent's companions successfully swam to shore; one wore a Type III PFD identical to the one worn by the decedent.

The decedent was a strong swimmer.

The decedent started for shore and then turned around and returned to the boat, exerting additional effort and increasing the likelihood of hypothermia.

The only reason the decedent gave for his decision to stay with the boat was his concern about the financial loss if the boat were not recovered.

The decedent put the life jacket on with the less visible green side rather than the more visible yellow side showing.

When the decedent's body was recovered, one arm was only partially through the PFD and the PFD was unzipped, thus suggesting that the decedent might have failed to put it on properly or might have attempted to remove it.

Appellants' expert stated that it was possible the decedent had decided to swim to shore, found it was difficult to swim in the vest, and attempted to remove it.

In opposition to the finding, appellants presented evidence that textbook safety rules recommend staying with the boat. Appellants' expert stated that the Coast

---

**15.** Gemco points out that counsel for Ramsey did not object to question eight. We nevertheless consider the point, because Larsen preserved the right to complain.

Guard does not qualify its recommendation to stay with the boat based on proximity to the shore, and, according to Coast Guard standards, Ramsey did the prudent thing by staying with the boat. Appellants also presented testimony by the Wilson brothers that Ramsey zipped his PFD when he put it on. However, the Wilsons' testimony was impeached by their earlier statements which indicated they could not remember whether the PFD had a zipper or a buckle.

A negligent failure to discover or guard against a product defect is not a defense against strict products liability. *Keen v. Ashot Ashkelon, Ltd.*, 748 S.W.2d 91, 92 (Tex.1988); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 432 (Tex.1984). However, this principle does not mean that *no negligence* of the injured party can be considered in a products liability suit. The issue becomes the nature of the negligent conduct. *Keen*, 748 S.W.2d at 92. Under the comparative causation scheme in *Duncan*, the jury may properly be asked to compare the plaintiff's conduct with the conduct or product of the defendant. *Duncan*, 665 S.W.2d at 428. The evidence detailed above goes not to the decedent's failure to discover a defect, if any, in the PFD. Instead, it was sufficient to support a conclusion that the decedent's conduct, independent of any qualities of the PFD, caused his death. For this same reason, we find the evidence was sufficient to support submission of question eight.

In *Williams v. Southern Pacific Transportation Co.*, 804 S.W.2d 132 (Tex.App.—Houston [1st Dist.] 1990, writ denied) this Court addressed a nearly identical situation. There, as here, the jury determined that the manufacturer and owner were not negligent, the product was not defectively designed, and the worker's injuries were caused by his own negligence. In affirming, we determined that sufficient evidence supported the jury's determination that the product was not defective. Therefore, since there was no product defect, the decedent's negligence must have involved something other than his failure to discover one. *Williams*, 804 S.W.2d at 139–40. *See also*

*Mooney Aircraft Corp. v. Altman*, 772 S.W.2d 540, 543–44 (Tex.App.—Dallas 1989, writ denied) (evidence of plaintiff's contributory negligence was more than a mere failure to discover or guard against a product defect, thus trial court erred in disregarding jury's finding of contributory negligence). 772 S.W.2d at 544.

Further, as discussed more fully below, we do not interpret the finding of 100 percent negligence on the decedent to require a conclusion that the jury was biased. The apportionment may logically be a reflection of the jury's earlier determinations that the PFD was not unfit and that Gemco had not failed to give proper warnings regarding its use. Once the jury attributed any negligence at all to the decedent, its only choice in allocating the percentage of causation was between the decedent and Gemco (or the PFD), which it had previously absolved of liability.

We overrule Ramsey points of error four and five and Larsen points of error 13, 14, and 27.

### The finding of zero damages and jury bias and improper conduct

The trial court erred in entering judgment on the jury's answers to questions 10, 11, and 12 because the answers were not supported by the evidence. (Ramsey points 6, 7, 8; Larsen points 15–20)

The trial court erred in overruling appellants' motion for new trial based on improper jury contact by Gemco's counsel and in entering judgment on the jury's answers to questions 10, 11, and 12 because the answers were the result of bias and prejudice resulting from improper jury conduct in its deliberations. (Larsen points 21, 22)

In challenging the sufficiency of the evidence to support the jury's answer of "zero" to the damages issues, appellants point out that all the evidence supported the fact that they suffered some amount of damages from the death of Ikey Ramsey. The dispute at trial was not over the existence but, rather, the amount of those damages. Appellants' expert testified that the total damages suffered by all appellants were as much as $2,122,788, while Gemco's

expert put the figure at $411,397. Thus appellants conclude that the jury's answers of "zero" were supported by no evidence.

It has long been the law in Texas that a finding of zero damages, even if contrary to the uncontroverted evidence, is rendered immaterial, by a finding of no liability. *Southern Pine Lumber Co. v. Andrade*, 132 Tex. 372, 124 S.W.2d 334, 335 (1939). A zero damage award presents no reversible error when the jury finds on sufficient evidence that defendant committed no negligent act, because even if damages were awarded, the trial court would still be required to enter the take-nothing judgment it did enter. *Dunn v. Sears Roebuck & Co.*, 371 S.W.2d 731, 736 (Tex.Civ. App.—Houston 1963, writ ref'd. n.r.e.). Here, the jury's findings that the PFD was not defective and that Gemco was not negligent render the award of zero damages immaterial and negate any assertion of harm.[16]

Nevertheless, relying on *Crowe v. Gulf Packing Co.*, 716 S.W.2d 623, 625 (Tex. App.—Corpus Christi 1986, no writ), appellants insist that a jury must award a plaintiff something for every element of damages resulting from an injury. The distinction between *Crowe* and the case at hand is that the jury in *Crowe* found the defendant liable for the plaintiff's injuries. However, while it awarded $64,400 for some elements of damages, the jury in *Crowe* ignored uncontroverted evidence and awarded nothing for other elements, notably past and future physical pain and mental anguish. Stating that it was "inconceivable that the jury could find injury and compensable medical care, disfigurement and incapacity, and yet find no physical pain and mental anguish," the court reversed the judgment. *Crowe*, 716 S.W.2d at 625. The same distinction applies to *Galvan v. Fedder*, 678

S.W.2d 596 (Tex.App.—Houston [14th Dist.] 1984, no writ). This situation is inapplicable to the instant case.

Further, a finding of zero damages does not indicate bias or improper motive when the jury absolves the defendant of any fault. *Short v. Black & Decker, Inc.*, 728 S.W.2d 832, 841–42 (Tex. App.—Beaumont 1987, no writ); *Johnson v. Whitehurst*, 652 S.W.2d 441, 449 (Tex. Civ.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). When the evidence is sufficient to support the jury's finding of no liability, there is no presumption that a finding of zero damages was the result of prejudice or improper influence. *Southern Pine*, 124 S.W.2d at 335; *Dunn*, 371 S.W.2d at 736; *Martin v. Jenkins*, 381 S.W.2d 115, 121–22 (Tex.Civ.App.—Amarillo 1964), *writ ref'd n.r.e.*, 384 S.W.2d 123 (Tex.1964).

Larsen further contends that improper conduct by Gemco's counsel biased and prejudiced the jury and led to misconduct in its deliberations, thus tainting the jury's answers to all the special issues. Without limiting her complaint, Larsen focuses on the answers to issues 10, 11, and 12 as most clearly demonstrative of this bias.

To establish jury misconduct, the complaining party must show (1) misconduct occurred, (2) it was material, and (3) based on the record as a whole, it probably resulted in harm. *Redinger v. Living, Inc.*, 689 S.W.2d 415, 419 (Tex.1985); TEX. R.CIV.P. 327(a). The supreme court has specified that a motion for new trial based on jury misconduct must be supported by a juror's affidavit alleging that "outside influences" were brought to bear upon the jury. *Weaver v. Westchester Fire Ins. Co.*, 739 S.W.2d 23, 24 (Tex.1987); *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 850 (Tex.

---

**16.** Although our analysis may properly end here, we note that Gemco also argues the evidence is sufficient to support a finding of zero damages. Specifically, Gemco points to the following factors which, we agree, may support the verdict: (1) the jury reasonably could have concluded that appellants suffered no damages *caused by Gemco;* (2) with a finding of no liability, the jury may have believed appellants could not *recover* any damages; (3) the jury's

opinion of injury could have been affected by the facts that Ramsey's son could not recall his father, his daughter had not lived with her father since her parents' divorce, and Ramsey's widow had remarried and was raising a family with her new husband; (4) no evidence of survival damages was introduced and the estate of Ikey Ramsey was not a party to the suit, nor was the nonexistence of a pending administration proven.

App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); Tex.R.Civ.P. 327. In order to obtain a hearing without a juror's affidavit, the party must disclose a reasonable explanation and excuse as to why affidavits cannot be secured and must also state sufficient particularized allegations of material jury misconduct. *Roy Jones Lumber Co. v. Murphy,* 139 Tex. 478, 163 S.W.2d 644 (Com.App.1942). Here, the appellants presented only the affidavit of appellant Debra Ramsey alleging improper conduct on the part of counsel for Gemco. No explanation for the absence of a juror's affidavit was given.

 In her affidavit, Ramsey stated that she observed Elena DiIorio make a comment to some of the prospective jurors about the delay of the selection process, and, on more than one occasion during the two week trial, observed the same attorney smoking cigarettes and carrying on conversation with one or more members of the jury who also were smoking.[17] While we do not, under any circumstances, condone such conduct which clearly, in our estimation, gives rise at least to an appearance of impropriety, we nevertheless are compelled by the applicable rules to hold that Ramsey's affidavit was legally insufficient to show jury misconduct. *See Weaver,* 739 S.W.2d at 24; *Texaco, Inc.,* 729 S.W.2d at 850. In the absence of the required affidavit of a juror, the trial court did not err in overruling appellants' motion for new trial based on jury misconduct. *Texaco, Inc.,* 729 S.W.2d at 850–51.

 Furthermore, even if we could consider it, the affidavit does not allege any specific act of jury misconduct, nor does it identify the juror or jurors involved in the misconduct. Other than the suggestion that the unspecified jury misconduct resulted in the zero damages award, which we have already found to be without merit, appellants do not show what the jury misconduct was or that it was material or caused them harm. *See American Home Assur. Co., v. Guevara,* 717 S.W.2d 381, 384 (Tex.App.—San Antonio 1986, no writ) (allegations of jury misconduct must be made on knowledge, not suspicion or hope); *Cortez v. Medical Protective Co.,* 560 S.W.2d 132, 136–37 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.) (affidavit must set forth facts showing misconduct and harm). There is no evidence in the record showing any outside influence was improperly brought to bear on the jury. Therefore, the trial court did not abuse its discretion in failing to grant a new trial. *See Sharpe v. Safway Scaffolds Co.,* 687 S.W.2d 386, 394 (Tex.App.—Houston [14th Dist.] 1985, no writ)

Accordingly, we overrule Ramsey points of error six, seven and eight and Larsen points 15–22.

### Impeachment of the Wilsons

The trial court erred in admitting transcripts and tapes of out-of-court statements allegedly made by Dewey and Tommie Wilson. (Larsen point 26)

Larsen contends that the trial court committed reversible error in admitting, over her objection, two purported out-of-court statements of Dewey and Tommie Wilson.[18] Alternatively, if the hearsay statements were admissible as impeachment evidence, *see Singleton v. Carmichael,* 305 S.W.2d 379, 384–85 (Tex.Civ.App.—Houston 1957, writ ref'd n.r.e.), then Larsen contends no proper foundation was laid for their admission. In addition, according to Larsen, the

---

**17.** Ramsey also stated that, to the best of her knowledge, the contacts did not touch on any matters directly relevant to the case. However, she speculates that the contacts had the intended effect of establishing a relationship and ingratiating the defendant with the jury, thus tending to make the defendant more sympathetic in the jurors' eyes. Gemco does not deny that the contacts took place.

**18.** In particular, the statements raised questions about the Wilsons' trial testimony including questions regarding water temperature and wa-

ter and wind conditions—it was "cool," it was cold but "not that cold," there was a "blue norther" coming as opposed to a "squall line," it took less than two hours to swim to shore, the water "wasn't really that rough," wave heights were 2 to 3 feet, the wind "wasn't blowing that hard,"— and about the accuracy of the Wilsons' trial testimony that Ramsey zipped the PFD when he put it on—the earlier statements indicated that they could not remember whether the jacket had a buckle or zipper.

statements were not properly authenticated.

■ For evidence of a prior inconsistent statement to be admissible, the witness must be told the contents of the statement, the time, place, and person to whom it was made, and must be afforded an opportunity to explain or deny the statement. *See Carrick v. Hendrick,* 351 S.W.2d 659, 662 (Tex.Civ.App.—Amarillo 1961, no writ); Tex.R.Civ.Evid. 613(a). Evidence of the prior inconsistent statement is admissible *unless the witness "unequivocally admits having made such statement."* Tex.R.Civ.Evid. 613(a). A review of the record reveals that both Wilson brothers were told of their prior statements and were given several opportunities to explain them. Tommie Wilson remembered that he did speak with the investigator but denied specific assertions, stating that he was unable to remember the substance of his statement even when reminded of it. Dewey Wilson remembered giving a statement to Barringer, but he did not recall the date, did not with certainty recognize his own voice on the tape, and did not remember making the specific statements reflected by the tape. Thus there was no error in admitting evidence of the statements.

■ As for the claim that the statements were not properly authenticated, we find that any complaint on this ground was waived. At trial, Larsen objected to Barringer's authentication of the tape "on grounds of authenticity, predicate, and also the fact that Mr. Barringer is not identified" in response to interrogatories. However, Larsen did not raise a point of error on appeal to challenge the admission of his testimony on this basis.[19] Instead, on appeal, Larsen's complaint is that Barringer's authentication was done outside the presence of the jury. No such objection was lodged at trial. Therefore, the error, if any, is waived. Tex.R.App.P. 52(a). *See also Benavidez v. Isles Construction Co.,* 726 S.W.2d 23, 25 (Tex.1980); *Washington v. Walker County,* 708 S.W.2d 493, 497 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) (failure to bring a specific point of error directing the court's attention to the complaint results in waiver).

We overrule Larsen's point of error number 26.

**Gemco's Cross-point**

■ Gemco contends by cross-point that the appellants' cause of action is preempted by the Federal Boat Safety Act of 1971, 46 U.S.C. §§ 4301–4311. We do not agree.

■ Gemco argues that the Coast Guard's power to promulgate boating safety regulations and its creation of a system of safety standards, compliance procedures, and certification for PFDs and their labels preempts the appellants' products liability suit in state court. The statute provides as follows:

> Unless permitted by the secretary under section 4305 of this title, a state may not establish, continue in effect, or enforce a law or regulation establishing a recreational vessel or associated equipment performance or other safety standard or imposing a requirement for associated equipment ... that is not identical to a regulation prescribed under section 4302 of this title.

46 U.S.C. § 4306. While the language of the provision clearly precludes conflicting regulatory action by the states in the field of boating safety and equipment, there is nothing in this section that suggests an intention to preempt personal injury lawsuits under state law.[20] Furthermore, the Federal Boating Safety Act of 1971 ex-

---

**19.** Even if she had brought forward a point of error on these grounds, at trial Larsen did not object to Barringer's testimony until after he testified. Thus, her objection was untimely, and we would necessarily consider it waived. *Clark v. Trailways,* 774 S.W.2d 644, 647 (Tex.1989).

**20.** In addition, there is a strong presumption against finding express preemption when the subject matter, such as the provision of tort remedies to compensate for personal injuries, is one that has traditionally been regarded as properly within the scope of the states' rights. *See Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

pressly includes a savings clause specifically providing that:

> Compliance with this chapter and the standards, regulations or orders promulgated hereunder shall not relieve any person from liability at common law under state law.

46 U.S.C. § 1489. Although Gemco contends that this provision does not apply, the plain language of the provision, coupled with its legislative history, certainly indicates otherwise:

> The purpose of the section is to assure that in a product liability suit, mere compliance by a manufacturer with the minimum standards promulgated under the act, will not be a complete defense to liability. Of course, depending on the rules of evidence of the particular judicial forum, such compliance may or may not be admissible for its evidentiary value.

Section 40, Senate Report 92-248, 1971 U.S.Cong. & Admin.News 1333, 1352.

Contrary to Gemco's assertion, we do not find the situation raised by application of the National Traffic and Motor Vehicle Safety Act to be analogous to the procedural circumstances of the instant case. In the cases Gemco relies on, the plaintiffs sued automobile manufacturers for failure to install a passive restraint system, specifically airbags. In this context, federal courts have held that preemption is proper. The courts reason that imposition of common law liability arising from the manufacturer's failure to install air bags would present an actual conflict with, and effectively eliminate, the federal regulatory requirements that clearly give automobile manufacturers the choice to install either manual safety belts or passive restraints. The key is in showing that the specific product defect alleged poses an *actual conflict* with the regulatory act. *See Pokorny v. Ford*, 902 F.2d 1116, 1119 (3d Cir.1990); *Kitts v. G.M.*, 875 F.2d 787, 789 (10th Cir. 1989); *Taylor v. G.M.*, 875 F.2d 816, 826 (11th Cir.1989); *Wood v. G.M.*, 865 F.2d 395, 402–403 and 409–10 (1st Cir.1988); *Surles v. Ford*, 709 F.Supp. 732, 734 (N.D.Tex.1988).

In our case, Ramsey sued Gemco, the *seller* of the product, not the manufacturer, alleging that it should provide *additional* warnings to those the manufacturer is required to provide by federal regulation. Because a verdict favorable to Ramsey would not present an actual conflict with the Federal Boat Safety Act, there is no basis for preemption.

We overrule Gemco's cross-point and affirm the judgment of the trial court.