SENECA RESOURCES CORPORATION and Energy Assets International Corporation, Appellants,

v.

MARSH & McLENNAN, INC., Appellee.

No. 01–94–00851–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 19, 1995.

Daniel O. Goforth, Houston, Carlene R. Lewis, Houston, for Appellants.

C. Henry Kollenberg, Houston, Lawrence O. Kamin, Houston, for Appellee.

Before COHEN, HEDGES and TAFT, JJ., concur.

## OPINION

HEDGES, Justice.

Seneca Resources Corporation and Energy Assets International Corporation (collectively, Seneca) appeal a take-nothing judgment in favor of appellee, Marsh & McLennan, Inc. (Marsh). Seneca had sued for damages from Marsh, an insurance broker, claiming that Marsh had violated the Insurance Code by making misrepresentations regarding Seneca's insurance coverage. We affirm.

### Factual and procedural background

Seneca is an oil and gas company. It is a subsidiary of National Fuel Gas Company

(NFG). In 1985, Seneca contracted with Dixilyn–Field Drilling Company (Dixilyn) to move a submersible drilling rig onto an off-shore oil and gas lease in the Gulf of Mexico and drill a well. The commencement of drilling, a process known as "spudding," began on the well in June 1985. In late October, the well was in its final completion stage. On October 25, as Dixilyn was preparing to move the rig, Hurricane Juan passed over the well. Because the rig was not properly ballasted, the hurricane winds toppled the rig, forcing the wellhead 20 feet under water. When its insurance carrier initially refused payment for the loss, Seneca began the litigation that culminated in this appeal.

## I. The insurance policies

### A. Buying the policies

Seneca was insured through Underwriters at Lloyds, London (Underwriters). Roger Wilcox, a vice president and the risk manager of NFG, was responsible for procuring Seneca's insurance. In the years relevant to this appeal, Seneca's insurance was procured in the following manner. Annually, Wilcox contacted Marsh, a nationwide insurance broker with offices in Houston, and apprised Marsh of his companies' insurance needs. Marsh contacted R.L. Jarrett, Inc., a United States insurance wholesaler, to seek a bid. R.L. Jarrett contacted the Lowndes Lambert Group, Ltd., an English broker. Lowndes Lambert contacted Underwriters and obtained a quote on available coverage and premiums. This information was communicated back through R.L. Jarrett to Marsh, whose account representative would directly contact Wilcox. Wilcox then made the final decision regarding the coverage to be purchased. Marsh would then bind the coverage by informing R.L. Jarrett, who would relay this information back up the chain.

### B. Types of coverage

Two types of coverage are relevant to this appeal. The first is "all risk platform insurance," which is basic property insurance that covers physical damage to all hardware surrounding the well.

The second type of coverage is "operator's extra expense" or OEE. OEE includes redrill coverage, which can be limited or unlimited. Limited redrill provides coverage up to the amount expended to drill the well. Unlimited redrill allows an insured to recoup up to its policy limits for redrill. Unlimited redrill coverage, by itself, provides redrill coverage for damage directly related to blowout or fire, but does not include coverage for named perils, such as windstorm or vessel collision; named peril redrill was, in 1985, an endorsement or extension to the basic policy, and not part of the policy itself. Named peril redrill customarily includes coverage for damage caused by windstorm. In this case, Seneca needed named peril coverage in order to recover for the damage to the wellhead that occurred when the hurricane toppled the rig.

Seneca's policies were renewed every October 1. The policy in effect from October 1, 1984, to October 1, 1985, was policy number 5196. The policy in effect from October 1, 1985, to October 1, 1986, was policy number 1134. Claims for property damage under all risk platform insurance accrue at the time of the loss. Therefore, any property damage that occurred because of Hurricane Juan was covered by policy 1134. However, a claim under the redrill provisions covered by OEE insurance begins to accrue on the date a well is spudded and matures when the well is completed. If a redrill claim has not matured at the policy termination date, the policy carries over into the next policy period until the date the well is completed. In this case, the well was spudded in June 1985 and had not been completed when the hurricane struck. Thus, policy 5196 would apply to any claim for redrill.[1]

### C. The policy summaries

From 1983 through 1985, Debbie McReynolds was the Marsh account representative assigned to the NFG account. Annually, around renewal time, she sent Wilcox a sum-

---

1. Seneca pursued a claim for redrill under policy 1134. That claim was submitted to arbitration, and the arbitrators determined that policy 1134 covered only damage to the platform, and not to the well. See the discussion of the claims under both policies, *infra*.

mary of coverage. In 1983, 1984, and 1985, the summaries she sent him included the following provision, reflecting that Seneca had named peril redrill coverage:

*Unlimited Redrill Expense*—The costs of redrilling a well which has been lost or damaged as a result of a blowout, crater, fire or named peril loss to drilling rig down to the depth at the time of loss.

(Emphasis added.) Notwithstanding this representation, none of the policies included named peril redrill coverage.

## II. The claims under policies 1134 and 5196

After applying deductibles, an independent insurance adjuster estimated Seneca's total claim for damages to be $4,709,532.54. This amount was based on damage to both the platform and the well. Seneca submitted a claim to Underwriters, which initially refused to pay because Seneca did not have named peril redrill coverage. Seneca filed a lawsuit against Underwriters, Marsh, Dixilyn, Lowndes Lambert, and R.L. Jarrett. Seneca's claims against Marsh included negligence, breach of fiduciary duty, misrepresentation and breach of warranty, violations of the insurance code, and breach of the duty of good faith and fair dealing.

The dispute regarding coverage under policy 1134 was submitted to arbitration in federal court under that policy's arbitration agreement. The arbitrators determined that policy 1134 covered all "equipment lost or damaged 'above the lowest well head casing joint'" but did not cover damage to the well itself. The arbitrators found that Underwriters owed Seneca $1,745,368.45 for the covered property damage. Pursuant to a stipulation between Seneca and Underwriters, the panel awarded Seneca attorneys' fees of over $1.8 million and prejudgment interest of over

$1.3 million. Underwriters thus paid Seneca a total of almost $5 million.

Additionally, in connection with the arbitration of policy 1134, Underwriters and Seneca entered into an agreement under which: (1) Underwriters would pay Seneca the amount of the arbitration award plus a settlement of $6,067.93; (2) Underwriters would be liable for no more than $10,000 under policy 5196; (3) Seneca would pursue its lawsuit against Dixilyn and others; (4) Seneca would retain the first $1.5 million of any recovery in those lawsuits; and (5) Seneca would evenly split any additional recovery with Underwriters, up to the full amount of payments made by Underwriters to Seneca. Underwriters continued to refuse to pay for redrilling the well under policy 5196.

## III. The suit against Dixilyn

Seneca and Dixilyn entered into a settlement and release whereby Dixilyn paid Seneca $3.9 million. Seneca kept the first $1.5 million and split the remaining $2.4 million with Underwriters, pursuant to their agreement.[2]

## IV. The trial[3]

Before the start of trial, Seneca amended its pleadings. In its fourth amended pleading, Marsh was the sole defendant, and Seneca's sole cause of action was that Marsh's misrepresentation regarding the extent of Seneca's coverage constituted a violation of the Insurance Code. *See* TEX.INS.CODE ANN. art. 21.21 (Vernon Supp.1995).

### A. Wilcox's testimony

Roger Wilcox, NFG's vice president and risk manager, testified as follows. The summaries provided by Marsh represented that Seneca had named peril redrill coverage insurance; he had also received "verbal com-

---

**2.** Seneca thus recovered:
  $1.7 from Underwriters as the arbitration award for its loss under policy 1134;
  $6,067.93 from Underwriters as additional settlement of the claim under policy 1134;
  Approximately $1.8 million in attorneys' fees from Underwriters;
  Approximately $1.3 million in prejudgment interest from Underwriters; and

$2.7 million from Dixilyn.

**3.** At the start of the trial, at the request of Seneca and Underwriters, in a proceeding characterized as a declaratory judgment action, the trial court considered Underwriters' liability to Seneca under policy 5196 and concluded Underwriters had no liability under that policy. The trial court then severed the declaratory judgment action.

ments that told me I had named peril coverage." He met annually with McReynolds to discuss renewal, and they would review the summaries together. Although he had "no specific recollection" about what McReynolds told him at the renewal meetings, he remembered that they reviewed the summaries "item by item." McReynolds never wrote or advised him that the summaries were incorrect. In conferences with McReynolds, he stressed to her that he wanted coverage for hurricane loss. He stated, "We would not operate offshore in Hurricane Alley without hurricane coverage. And Marsh & McLennan time and time again, in their summaries and in conversations with them, assured me that I had that coverage."

## B. McReynolds testimony

McReynolds testified as follows. In 1983, the initial quote she received from R.L. Jarrett reflected that Underwriters was offering coverage with named peril redrill for no additional premium. She communicated this to Wilcox, bound the coverage at his instruction, and included that information in the summary of coverage she prepared and gave to Wilcox. She also discussed the summary with Wilcox in detail. Later, however, when she received the actual policy, McReynolds reviewed it and found that it did not contain named peril redrill coverage. She called R.L. Jarrett and told representative Bud Brickey that the named peril endorsement was missing. Brickey told her that he would "take care of the situation." McReynolds then sent the policy to Wilcox, along with a letter that stated in part:

> Upon review of the policy we found several items that need to be amended and the Underwriters are issuing indorsements at this time. A summary of these changes is attached.
> We trust you find the enclosed in order. We will forward the amending endorsements as soon as possible.
> ....
> The following will be amended by endorsement to Policy RLJ 01095:
> ....
> *Redrill as a result of named peril to the drilling rig.

Shortly after McReynolds sent this letter, Brickey called her and told her that Underwriters would not provide the named peril redrill coverage at no charge, and that the named peril endorsement would cost Wilcox an additional 10 to 20 percent. She communicated this information to Wilcox, who decided to forego the named peril redrill coverage.

In the spring of 1984, McReynolds met with Wilcox to discuss coverages; they talked about named peril redrill coverage, and Wilcox asked McReynolds to search for named peril redrill coverage at no additional premium. The quote she received from R.L. Jarrett offered the same terms and conditions as the previous year's coverage, which did not include named peril redrill coverage. That coverage was available for an additional premium of 10 to 20 percent, or an additional $40,000 to $80,000, as it had been the previous year. She conveyed this information to Wilcox, who once again declined the named peril redrill coverage and renewed the existing coverage.

McReynolds assigned an employee to prepare a coverage summary outlining the 1984 renewal. She told the employee that the only changes were to the rates, and "to update the document I had sent in '83–'84" to include the new rates. Because the employee changed only the rates, the policy 5196 coverage summary sent to Wilcox in the fall of 1994 included the same erroneous statement regarding named peril redrill that had appeared in the 1983 summary.

McReynolds also testified that when Wilcox called her with questions about coverage, his questions were always based on the policy itself, and not on the summary.

## C. Other witnesses

Bill Petmecky, a Seneca executive, testified about the events surrounding the hurricane and the damage to the well. He stated that no one from Marsh ever informed him that the summaries' representations that Seneca had named peril redrill coverage were incorrect.

Robert Daniels, an insurance wholesaler, testified as an expert on behalf of Seneca. He stated that, based on the summaries, Marsh misrepresented the extent of Seneca's coverage. He also testified that the customary practice in the insurance brokerage business was to document in writing the types of communications McReynolds testified she had with Wilcox about the change in offered coverage and his decision not to purchase named peril redrill.

## D. The verdict

Only two questions were submitted to the jury. The jury found that Marsh had made misrepresentations, but that Seneca incurred no damages as a result of those misrepresentations. The questions and answers are as follows:

### JURY QUESTION 1

Did MARSH & MCLENNAN engage in any unfair or deceptive act or practices?

"Unfair or deceptive act or practice" means any of the following:

Making or causing to be made, issued, or circulated, any estimate, illustration, circular or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby, or

Making or causing to be made any statement misrepresenting the terms, benefits, or advantages of an insurance policy, or

Making any misrepresentation relating to insurance.

"Misrepresentation" means any of the following:

a. any untrue statement of a material fact; or

b. any failure to state a material fact that is necessary to prevent the statements made from being misleading, when these statements are considered in the light of the circumstances when made; or

c. the making of any statement in such a manner or order as to mislead a reasonably prudent person to a false conclusion of a material fact.

Answer "Yes" or "no."

Answer: *YES*

### JURY QUESTION 2

If your answer to Question 1 is "yes," then answer the following question....

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate SENECA for its damages, if any, that resulted from such unfair or deceptive act or practices?

Consider the following elements if damages, if any, and none other:

The difference between the amount of money the Plaintiff recovered for its loss and what it would have recovered had the named peril insurance been obtained.

. . . .

Answer: $0

Seneca objected to the submission of question number two on the basis that a question on causation was inappropriate. The trial court denied the objection.

### Causation

■ In point of error three, Seneca asserts it was entitled to policy benefits as a matter of law because in question one the jury found that Marsh had made misrepresentations. Seneca contends that the trial court erred in overruling its motion for new trial and, alternatively, its motion to disregard the jury findings or motion for judgment non obstante verdicto, because the jury's answer to question number two was immaterial. It bases its position on its reading of *Vail v. Texas Farm Bureau Mutual Insurance Co.,* 754 S.W.2d 129 (Tex.1988). In that case, Seneca asserts, the supreme court has discarded the necessity of proving causation once there has been a finding of misrepresentation of policy benefits. We disagree with this interpretation.

In *Vail,* the plaintiffs sued their insurer for bad faith failure to pay a claim. The supreme court held, among other things, that "an insurer's unfair refusal to pay the insured's claim causes damages as a matter of law in at least the amount of the policy benefits wrongfully withheld." *Id.* at 136. Seneca argues that, based on this holding, it was "entitled to the undisputed policy bene-

fits as a matter of law" once a misrepresentation in violation of the Insurance Code was found. We disagree. We believe that Seneca has taken the quoted language out of context and has misunderstood its import. We conclude that *Vail* does not apply to the case before us.

A fire destroyed the Vails' home. After their insurer, Texas Farm, refused to pay their claim, the Vails sued Texas Farm for the full amount of the policy and for damages under the DTPA and the Insurance Code. *Id.* at 130. A jury found that Texas Farm had intentionally failed to exercise good faith in the processing of the Vails' claim, and the trial court awarded the Vails the full amount of the policy. *Id.* at 131. On appeal, Texas Farm argued that the Vails could not recover because their sole claim was for damages recoverable under the insurance contract. Texas Farm asserted that the amount due under the policy represented damages for breach of contract, not actual damages for a claim of unfair claims settlement practices. *Id.* at 136. Under Texas Farm's theory, because the Vails did not plead, offer evidence, or submit a jury issue on delay damages resulting from unfair settlement practices, they were not entitled to recover for unfair claims settlement practices under the DTPA. *Id.*

The supreme court disagreed:

> We hold that an insurer's unfair refusal to pay the insured's claim causes damages as a matter of law in at least the amount of the policy benefits wrongfully withheld. The Vails suffered a *loss* at the time of the fire for which they were entitled to make a claim under the insurance policy. It was not until Texas Farm wrongfully denied the claim that the Vails' loss was transformed into a legal *damage*. That damage is, at minimum, the amount of policy proceeds wrongfully withheld by Texas Farm.

*Id.* at 136 (citations omitted).

We believe that the "as a matter of law" language in the first quoted sentence means that policy benefits wrongfully withheld were the proper minimum measure of damages for unfair refusal to pay the insured's claim. Seneca's assertion that once it obtained a finding that Marsh made misrepresentations,

it was entitled to damages as a matter of law is an erroneous reading of *Vail.* The supreme court was describing a measure of damages, not removing the necessity of proving causation.

Our interpretation is supported by the supreme court's elaboration on its *Vail* holding in a recent bad faith case. In *Twin City Fire Insurance Company v. Davis,* 904 S.W.2d 663 (Tex.1995), the court addressed the question of whether policy proceeds denied an employee by a workers' compensation insurance carrier would, without more, support an award of punitive damages. The supreme court held that in order to recover punitive damages, a claimant must obtain jury findings of damages in addition to the benefits wrongfully withheld. Noting that the lower court had relied on the *Vail* language that "an insurer's unfair refusal to pay the insured's claim causes damages in at least the amount of the policy benefits wrongfully withheld" in upholding the punitive damages award, the supreme court found that *Vail* was not controlling:

> As it relates to the issue in this case, *Vail* was only concerned with the insurer's argument that policy benefits improperly withheld were not "actual damages in relation to a claim of unfair claims settlement practices." In rejecting the insurer's argument, we held that policy benefits wrongfully withheld were indeed actual damages under the DTPA and Insurance Code. Our holding was premised on the cumulative remedy provisions of the two statutes at issue.

*Davis,* at 666 (quoting *Vail,* 754 S.W.2d at 136). In a footnote, the supreme court further added:

> We also note that the court of appeals rephrased and broadened the rule we announced in *Vail,* holding: "A breach of the duty of good faith and fair dealing, however, results in damages, as a matter of law, in at least the amount of the benefits wrongly withheld." *This extrapolation— from a case involving an unfair refusal to pay policy benefits, to all bad faith cases— is unwarranted, even in the context of a DTPA or Insurance Code claim. The reason is that some acts of bad faith, such as*

*a failure to properly investigate a claim or an unjustifiable delay in processing a claim, do not necessarily relate to the insurer's breach of its contractual duties to pay covered claims, and may give rise to different damages.*

*Id.* n. 3 (quoting *Davis v. Twin City Fire Ins. Co.,* 865 S.W.2d 231, 236 (Tex.App.—Texarkana 1993)) (emphasis added).

It is clear that the referenced holding in *Vail* applies to cases involving an insurer's unfair refusal to pay, and means that "policy benefits wrongfully withheld were indeed actual damages under the DTPA and Insurance Code." It does not mean that a finding of misrepresentation of policy benefits automatically entitles a plaintiff to damages without a showing of causation. *Vail* is inapplicable to the case before us. We agree with Marsh that Seneca was required to prove that its damages were caused by Marsh's violation of the Insurance Code. *See First Am. Title Co. v. Prata,* 783 S.W.2d 697, 701 (Tex.App.—El Paso 1989, writ denied).

In points one and two, Seneca asserts the trial court erred in submitting a causation and damages question to the jury. Seneca relies on *Vail* as support for these points of error. We have held that *Vail* is inapplicable to this case, and that Seneca was required to prove that its damages were caused by Marsh's misrepresentation.

We overrule points of error one, two, and three.

### Sufficiency of the evidence

■ In points of error four through seven, Seneca argues that the evidence is legally and factually insufficient to support the jury's answer to question number two; that the evidence established as a matter of law that it was damaged in the amount of $2,964,-164.09; and that the trial court erred in overruling its motion for new trial, motion to disregard the jury's findings and motion for j.n.o.v. The jury found, in question one, that Marsh had engaged in an unfair or deceptive act or practice. In question number two,

however, it found that no damages resulted from the unfair or deceptive act or practice.

When the party with the burden of proof challenges the legal sufficiency of the evidence to support the jury's failure to find in its favor, it must show that no evidence supports the failure to find and that the evidence establishes the desired finding as a matter of law. *Ramsey v. Lucky Stores, Inc.,* 853 S.W.2d 623, 632 (Tex.App.—Houston [1st Dist.] 1993, writ denied). A challenge to the factual sufficiency requires the party with the burden of proof to establish that the nonfinding is so contrary to the great weight of the evidence as to be manifestly unjust. *Id.* In resolving a no evidence challenge in this context, we consider only the evidence that tends to support the failure to find. If there is no evidence to support the failure to find, we then examine the record to determine whether it establishes the contrary as a matter of law. *Id.* A factual insufficiency point requires us to consider all the evidence, both in support of and contrary to the finding. *Id.*

Seneca asserts the evidence showed that: (1) Marsh misrepresented that Seneca had named peril insurance; (2) its loss was estimated to be $4.7 million; (3) it recovered approximately $1.7 million; and (4) the difference between its loss and the amount recovered was $2,964,164.09. Seneca argues that the jury was instructed that the only element of damages it could consider was the difference between the amount of money Seneca had recovered for its loss and what it would have recovered had named peril insurance been obtained. It concludes that the jury could have only found damages in the amount of $2,964,164.09.[4]

Marsh asserts that the evidence demonstrated that its actions did not cause any damages. It relies on the testimony of McReynolds that she discussed named peril redrill coverage with Wilcox, that he declined to purchase it, and that, notwithstanding the erroneous summaries that reflected Seneca had named peril redrill coverage, Wilcox was

---

4. We note, however, that the jury was asked to determine "[w]hat sum of money, *if any,* ... would fairly and reasonably compensate SENE-CA for its damages, *if any,* that resulted from such unfair or deceptive act or practice." (Emphasis added.)

fully aware of the extent of the coverage he purchased for Seneca.

In its answer to question one, the jury found that Marsh engaged in an unfair or deceptive act or practice. Indeed, it could not have found otherwise. "Unfair or deceptive act or practice" was defined to mean any of the following:

Making or causing to be made, issued, or circulated, any estimate, illustration, circular or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby, or

Making or causing to be made any statement misrepresenting the terms, benefits, or advantages of an insurance policy, or

Making any misrepresentation relating to insurance.

McReynolds admitted that the summaries contained the erroneous statement that Seneca had named peril redrill coverage. Thus, the jury had to find, at the very least, that Marsh "[made] or caused to be made, issued, or circulated, any estimate, illustration, circular or statement misrepresenting the terms of any policy issued or to be issued." However, the jury could have believed McReynolds' testimony that she told Wilcox that the policy did not include named peril redrill coverage, and that he declined, in 1983 and 1984, to pay extra for such coverage. Based on this testimony, the jury could have concluded that although Marsh literally made a misrepresentation (as defined by question number one) by sending Wilcox the summaries containing erroneous information, it obviated any harm caused by the misrepresentation when McReynolds told Wilcox that Seneca did not have named peril redrill coverage. In other words, the jury could have believed that although the summaries contained a misrepresentation about the terms of the policies, Seneca was not harmed by the misrepresentations because Wilcox knew there was no named peril redrill coverage, and had made an informed decision not to purchase such coverage.

We conclude that the evidence was legally and factually sufficient to support the jury's answer to question two.

We overrule points of error four, five, six, and seven.

### Evidentiary rulings

In points of error eight, nine, and ten, Seneca asserts that the trial court abused its discretion when it admitted evidence regarding: (1) Seneca's level of sophistication with respect to insurance; (2) Seneca's reliance on Marsh's misrepresentations; and (3) Seneca's recovery from other sources.

The standard of review for the admission or exclusion of evidence is abuse of discretion. *Lyondell Petrochemical Co. v. Fluor Daniel, Inc.,* 888 S.W.2d 547, 550 (Tex. App.—Houston [1st Dist.] 1994, writ denied). To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was erroneous and that the error was calculated to cause and probably did cause the rendition of an improper judgment. *Id.;* TEX.R.APP.P. 81(b)(1).

### I. Recovery from other sources

In point of error 10, Seneca asserts that the trial court improperly admitted testimony relating to Seneca's recoveries from other sources. Specifically, it complains of questions asked of Bill Petmecky, one of Seneca's witnesses. The first two relate to recovery from Dixilyn, the rig owner:

And if it was an unseaworthy rig, you could have sued Dixilyn, couldn't you?

. . . .

... [Y]ou might be able to sue a drilling rig owner, wouldn't you?

The trial court sustained timely objections to these two questions, and no testimony was elicited in response. There was no trial court error about which to complain.

█ The third question about which Seneca complains concerns recovery of insurance benefits:

Now, did you receive any money from the insurance company? In response to Seneca's objection, Marsh argued that although Seneca had presented evidence that its total loss was $4.7 million, it had received approximately $1.7 million for its property damage.

Marsh was trying to establish, by this question, that Seneca's loss for damage to the well was only $3 million. Seneca responded that it had planned to present evidence of the $4.7 million loss to the jury and ask the trial court to credit it for the $1.7 it received for property damages. However, Seneca's trial counsel stated, "I frankly don't care.... If the Court would rather tell the jury that our loss was 3 million, that we were paid 1.7 million under physical damage, I don't mind." The trial court later allowed Marsh to elicit testimony from Petmecky that Seneca recovered $1.7 million for physical damage. The trial court did not err in allowing this testimony, and Seneca waived any complaint by agreeing to tell the jury about the $1.7 million recovery for physical damage.

## II. Evidence of Seneca's level of sophistication and its reliance on misrepresentations

In points of error eight and nine, Seneca complains that the trial court abused its discretion in admitting evidence about Seneca's level of sophistication in insurance matters and Seneca's lack of reliance on the misrepresentations. Specifically, Seneca objects to testimony elicited from Wilcox regarding his expertise in the field of risk management.

■ Marsh's trial counsel elicited testimony from Wilcox regarding the professional risk and insurance organizations to which he belonged, the offices he held, the committees to which he belonged, the topics of discussion at those organizations' meetings, and his attendance at insurance seminars. Wilcox testified at great length (almost eight pages in the statement of facts) before Seneca's trial counsel objected to the line of questioning on the basis of relevancy. Seneca's objection was not timely. We reject Seneca's complaint that this testimony violated a motion in limine because a motion in limine does not preserve error on appeal. Unless a proper, timely objection is made when an improper question has been asked in violation of a motion in limine, error is waived. *Davis v. Stallones*, 750 S.W.2d 235, 237 (Tex.App.— Houston [1st Dist.] 1987, no writ).

■ Seneca also complains that the trial court erroneously admitted testimony about the cost of named peril redrill coverage (1) over its hearsay objections and (2) despite the trial court's ruling on its motion in limine. We will address the hearsay objections under the point of error specifically dealing with that subject. A ruling on a motion in limine preserves nothing for appellate review.

We overrule points of error eight, nine, and 10.

In related question number 11, Seneca asserts that the jury disregarded the instructions in question number two and considered factors not properly before it. Seneca's argument concerning this point of error is based on its assertion that the trial court erred in admitting evidence regarding Seneca's level of sophistication with regard to insurance, its reliance in Marsh's misrepresentations, and its recovery from other sources. In light of our disposition of points of error eight, nine, and 10, we also overrule point of error 11.

### Hearsay

■ In point of error 12, Seneca asserts that the trial court abused its discretion in admitting hearsay testimony over objection. The trial court allowed McReynolds to testify about statements made to her by Bud Brickey, a representative of R.L. Jarrett. McReynolds testified that R.L. Jarrett originally notified her by letter that named peril redrill coverage would be included in NFG's policy at no extra cost. Later, Brickey advised her that NFG would have to pay an additional premium of 10 to 20 percent more for this coverage. McReynolds further testified that when she called Wilcox, explained the situation, and asked him if he wanted to pay the additional premium for named peril, he declined named peril redrill coverage.

Seneca raised a hearsay objection to this testimony. Marsh argued that it was admissible to show McReynolds' state of mind. The trial court admitted it on that basis and gave a limiting instruction to that effect.

We conclude that error, if any, in admitting this testimony is harmless. Seneca points out in its brief that it asked the trial court to limit McReynolds to testifying that

"she learned the coverage would require an additional premium." Generally, error in the admission of testimony is deemed harmless if the objecting party later permits the same or similar evidence to be introduced without objection. *Richardson v. Green,* 677 S.W.2d 497, 501 (Tex.1984). Here, Seneca *advocated* the admission of testimony similar to that which it found objectionable. Seneca cannot show the objected-to testimony caused the rendition of an improper judgment. *See* TEX. R.APP.P. 81(b)(1).

We overrule point of error 12.

### Fixed damages

In point of error 13, Seneca asserts that its damages were fixed as a matter of law and that it was entitled to treble damages. We have already addressed the issue of damages in our discussion of causation and sufficiency of the evidence.

We overrule point of error 13.

### Conclusion

We affirm the judgment of the trial court.