NO.
12-06-00411-CV

 

IN THE COURT OF APPEALS

 

TWELFTH COURT OF APPEALS DISTRICT

                        

TYLER, TEXAS

 

CANAL INSURANCE COMPANY,         §          APPEAL FROM THE 

APPELLANT

 

V.        §          COUNTY COURT AT LAW OF

 

MARK HOPKINS D/B/A 

HOPKINS TOWING AND  §          NACOGDOCHES COUNTY, TEXAS

RECOVERY,

APPELLEE




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



OPINION ON
REHEARING

            Canal Insurance Company filed a motion for rehearing,
which is granted.  The court’s opinion of
June 29, 2007 is withdrawn and the following opinion is issued in its place.

            Canal
Insurance Company appeals the trial court’s final judgment in a lawsuit brought
by Mark Hopkins d/b/a Hopkins Towing and Recovery to recover towing charges
incurred by Paul Mullinax, Canal’s insured. 
Canal raises ten issues on appeal. 
We affirm.

 

Background

            On August 20,
2004, Henry Sweeney was operating a tractor-trailer rig hauling a load of peas
when he lost control of the rig, which traveled off the road and into a deep
ditch.  The tractor-trailer struck
several small trees and, eventually, rolled over onto its left side.  Sweeney was the lessee and operator of the
tractor, which was owned by Mullinax. 
Mullinax also owned the trailer.  Both
the tractor and trailer were insured against physical damage under an insurance
policy issued by Canal.  Mullinax was the
named insured.








            Sweeney was injured in the wreck and
was removed from the tractor by emergency personnel.  As Sweeney was being removed from the
tractor, Trooper Jimmie Faulkner of the Texas Department of Public Safety
arrived at the wreck site.  After Sweeney
had been removed and placed on a gurney, Trooper Faulkner approached Sweeney
and briefly interviewed him.  Following
the interview, Sweeney was taken by ambulance to a hospital for treatment.  

            Trooper Faulkner ordered that a
wrecker service be called in to tow the tractor and trailer.  After two other wrecker services had refused
the job because they “didn’t have the capabilities to do it,” Hopkins was
called in to do the job.  Because of the
layout of the wreck site and the position of the tractor and trailer, Hopkins
determined that they would have to use special air bags to return the trailer
to an upright position.  Hopkins
recruited a subcontractor out of Tyler, Texas to supply the necessary air bags
and operating personnel.  In addition,
Hopkins supplied three of his tow trucks and seven or eight employees who
worked through the night, and in the rain, in order to remove the tractor and
trailer from the ditch.

            The tractor and trailer were
initially towed to a vehicle storage facility operated by Hutto’s Wrecker
Service.  At Mullinax’s later request,
Hopkins subsequently towed both to Hopkins’s own vehicle storage facility.  Hopkins submitted a bill of $12,690.00 to
Mullinax for the work his company performed to remove the tractor and trailer
and tow them to Hutto’s facility, and for the work performed by the airbag
subcontractor.  When Mullinax failed to
pay the bill, Hopkins sought payment from Canal.  Because the language of the insurance policy
in question did not expressly provide coverage of third parties who perform
towing services, Canal refused to pay Hopkins.

            Hopkins filed a lawsuit against both
Mullinax and Canal.  Hopkins’s cause of
action against Canal was based upon section 2303.156(b) of the Texas
Occupations Code.  See Tex. Occ. Code Ann. § 2303.156(b)
(Vernon 2004).  Mullinax filed a pro se
answer but did not appear at trial. 
Canal filed an answer and appeared at trial by way of its
representative, Ron King, and through counsel. 
Following a bench trial, the trial court entered a final judgment
against Mullinax and Canal, holding them jointly and severally liable to
Hopkins for the initial towing charges of $12,690.00 plus prejudgment interest
and court costs.  This appeal followed.

 

Consent to Tow

            In
its first issue, Canal challenges the legal and factual sufficiency of the
evidence supporting

 the
trial court’s implied finding of fact that the tow in question was not
performed with consent, a nonfinding.[1]

Standard of Review








            Section
2303.003(a) of the Occupations Code states that “[t]his chapter does not apply
to a vehicle stored or parked at a vehicle storage facility with the consent of
the owner of the vehicle.” Tex. Occ.
Code Ann. § 2303.003(a) (Vernon 2004). 
As such, a defendant may raise the issue of consent as a defense to actions
brought under section 2303.156(b).  Cf.
Brown & Root, Inc. v. Shelton, No. 12-01-00259-CV, 2003 WL
21771917, at * 2 (Tex. App.–Tyler July 31, 2003, no pet.) (not yet released for
publication) (construing a statute of repose as a defense to a personal injury
action based on strict liability or negligence).  For the purposes of our analysis here, we
assume that Sweeney could give consent under section 2303.003(a).[2]

            In
this case, the issue of consent was a question of fact.  See Tackett v. Terrill, 404
S.W.2d 158, 160 (Tex. Civ. App.–Eastland 1966, no writ) (“[I]t is apparent that
whether the widow consented or not [to an autopsy of her late husband] was a
question of fact.”).  Implied findings of
fact may be challenged for legal and factual sufficiency.  Wade v. Comm’n for Lawyer Discipline,
961 S.W.2d 366, 374 (Tex. App.–Houston [1st Dist.] 1997, no pet.).  The standard of review is the same as that
applied to a jury’s findings or a trial court’s written findings of fact.  Id.








            When
reviewing a finding of fact for legal sufficiency, we may set aside a finding
of fact only if the evidence at trial would not enable a reasonable and fair
minded finder of fact to make the finding under review.  See City of Keller v. Wilson,
168 S.W.3d 802, 827 (Tex. 2005).  In
making this determination, we must credit favorable evidence if a reasonable
finder of fact could, and disregard contrary evidence unless a reasonable
finder of fact could not.  See id.  The finder of fact is the sole judge of the
credibility of the witnesses and the weight to be assigned to their
testimony.  See id. at
819.  The finder of fact is free to
believe one witness and disbelieve another, and reviewing courts may not impose
their own opinions to the contrary.  See
id.  Accordingly, reviewing
courts must assume that the finder of fact decided all credibility questions in
favor of the verdict if a reasonable person could do so.  See id.  If a reasonable finder of fact could have
done so, we must assume that the finder of fact chose what testimony to
disregard in a way that was in favor of the verdict.  See id. at 820.  A finder of fact “may disregard even
uncontradicted and unimpeached testimony from disinterested witnesses” where
reasonable.  See id. at
819-20.  

            In
addition, it is within the finder of fact’s province to resolve conflicts in
the evidence.  See id. at
820.  Consequently, we must assume that,
where reasonable, the finder of fact resolved all conflicts in the evidence in
a manner consistent with the verdict.  See
id.  Where a reasonable finder
of fact could resolve conflicting evidence either way, we must presume the
finder of fact did so in favor of the verdict. 
See id. at 821. 
Where conflicting inferences can be drawn from the evidence, it is
within the province of the finder of fact to choose which inference to draw, so
long as more than one inference can reasonably be drawn.  See id. 
Therefore, we must assume the finder of fact made all inferences
in favor of the verdict if a reasonable person could do so.  See id.

            Regarding
factual sufficiency challenges, when the party who had the burden of proof on
an issue in a bench trial complains about the absence of a finding of fact by
the trial court, we treat the absence of the finding as a refusal by the trial
court to find the fact from a preponderance of the evidence.  Santa Fe Petroleum, L.L.C. v. Star
Canyon Corp., 156 S.W.3d 630, 637 (Tex. App.–Tyler 2004, no pet.)
(citing Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex.
1989)). When the party who had the burden of proof on an issue asserts that the
trial court’s refusal to find the fact is contrary to the evidence, we must
overrule the complaint unless, considering all the evidence, the refusal is so
contrary to the great weight and preponderance of the evidence that it is
manifestly unjust.  See Ramsey v.
Lucky Stores, Inc., 853 S.W.2d 623, 632 (Tex. App.–Houston [1st Dist.]
1993, writ denied) (citing Cropper v. Caterpillar Tractor Co.,
754 S.W.2d 646, 649 (Tex.1988)).

            When
reviewing factual sufficiency issues arising from a bench trial, we must
remember that the trial court, as the trier of fact, is the sole judge of the
credibility of the witnesses and the weight to be given their testimony.  Santa Fe Petroleum, 156 S.W.3d
at 638.  The trial court may take into
consideration all of the facts and surrounding circumstances in connection with
the testimony of each witness and accept or reject all or any part of that
testimony.  Id.  Where enough evidence is before the trial
court so that reasonable minds could differ on the meaning of the evidence, or
the inferences and conclusions to be drawn from the evidence, we may not
substitute our judgment for that of the trial court.  Id.

 








Discussion

            It
is undisputed that Mullinax was not contacted before the initial tow was conducted.  Also, it is axiomatic that Mullinax’s
subsequent consent to later tows does not relate back in time and render the
initial tow consensual.  Therefore, the
only disputed question of fact before the trial court was whether Sweeney gave
consent to conduct the initial tow.

            Neither
Sweeney nor Mullinax testified at trial. 
Hopkins testified that he did not speak with Sweeney before the initial
tow.  The only remaining possibility is
that Sweeney could have consented to the tow by expressing his consent to
Trooper Faulkner.  The sole witness at
trial regarding this possible consent was Trooper Faulkner.  He testified as follows:

 

Q          All right.  And did you learn who the owner of the
vehicle [that] was involved in that collision was when you arrived?

 

A          Yes, sir.

 

Q          How did you learn that?

 

A          I believe that I spoke to him briefly
before he went to the hospital.

 

Q          Him being who?

 

A          Mr. Henry Sweeney.

 

. . . .

 

Q          At the time, did you have any
conversation with him regarding [the] disposition he wanted made of the truck
or trailer?

 

A          I don’t recall.

 

. . . .

 

Q          Did he ever indicate to you his desire
that anything in particular be done with the truck and trailer?

 

A          Not to my knowledge.

 

. . . .

 

Q          Do you know how [Hopkins] was called
to the scene?

 

A          I believe at that time I did.  Or had somebody call him.

 

. . . .

 








Q          Did you ever talk to the owner of the
truck, a Mr. Paul Mullinax?

 

A          I can’t recall.

 

Q          Did anyone, to your knowledge, ever
call you and give you instructions as to what they wanted done with this truck
and trailer if it was removed?

 

A          Not to my knowledge.

 

. . . .

 

Q          [D]id you discuss [the fact that the
truck had rolled onto its side] with [Sweeney] and did he seem to be aware that
the truck was turned over?  Did he seem
to be aware of that?

 

A          I don’t know about turned over, but he
knew he was in [a] wreck.

 

Q          Did he seem to understand the truck
was going to have to be towed?

 

A          Yes.

 

Q          Did you tell him the truck was going
to be towed?

 

A          I usually ask the driver of the truck,
did you have a preference.  But on
18-wheelers most of them are from out of town. 
I’m sure I asked him who he wanted.

 

Q          Okay. 
So you recall a conversation with Sweeney about the truck was going to
have to be towed?  We have to get
something done here, correct?

 

A          Yes, sir.

 

Q          And he agreed to that?

 

A          I’m sure he did.

 

. . . .

 

Q          I’m not sure I understood.  Do you have any recollection if Mr. Sweeney
ever discussed with you who would tow that truck or how would it be towed or
anything of that nature?

 

A          Not specifically.  This is two years ago.

 

. . . .

 

Q          You are saying you may be recalling
another wreck involving a roll over?

 

A          Yes, sir.  And it is confusing me.

 

. . . .

 

Q          And from what you’re saying, again
based on recollection, when you did talk to Mr. Sweeney at the scene he
understood the tractor-trailer was going to be towed?  It was crystal clear to you and everybody
else [that] he wasn’t getting in it and neither was any other  truck driver going to get in it and drive it
away?

 








A          Yes.

 

Q          You don’t recall him saying, no, I can’t
do anything.  I have to talk to somebody
or do something special?  You don’t
remember that?

 

A          No, sir.

 

            Trooper
Faulkner gave conflicting testimony about whether he recalled Sweeney’s
expressing a consent to tow.  Because
this was a bench trial, it was within the trial court’s province to resolve
this conflict in the evidence.  See
City of Keller, 168 S.W.3d at 820.  Because a reasonable finder of fact could
have resolved this conflicting evidence in favor of a nonfinding of consent, we
must presume the trial court did so.  See
id. at 821.  Therefore,
after reviewing the record, we conclude that the evidence at trial was
sufficient to enable a reasonable and fair minded finder of fact to make a
nonfinding of consent.  As such, the
evidence was legally sufficient to support the nonfinding.  See id. at 827.

            Because
reasonable minds could differ on the conclusions to be drawn from Sweeney’s
testimony, we may not substitute our judgment for that of the trial court.  See Santa Fe Petroleum, 156
S.W.3d at 638.  After considering all the
evidence, we conclude that the trial court’s refusal to find that the tow was
consensual was not contrary to the great weight and preponderance of the
evidence.  Therefore, the evidence was
factually sufficient to support the trial court’s nonfinding of consent.  See Ramsey, 853 S.W.2d at 632.

            Having
held that the evidence supporting the trial court’s nonfinding of consent was
based on legally and factually sufficient evidence, we overrule Canal’s first
issue.

 

Total Loss

            In its second
issue, Canal challenges the legal sufficiency of the evidence supporting the
trial court’s written finding of fact that Canal had paid “a claim of total
loss on a vehicle.”  Specifically, Canal
claims that there was “no evidence that Canal paid ‘a claim of total loss.’”  It is undisputed that Canal paid an insurance
claim to Mullinax for the damage to the tractor and trailer.  Likewise, Canal does not challenge the
following pertinent findings of fact made by the trial court:

 

16.        The
estimated fair market value of the truck prior to the wreck was $10,000, while
the estimated cost to repair was $10,687.17.

 








17.        The
estimated fair market value of the trailer prior to the wreck was $9,125.00,
while the estimated cost to repair was $11,509.20.

 

Unchallenged
findings of fact, absent fundamental error, are not subject to appellate review
and must be accepted by an appellate court as proven facts.  See Lovejoy v. Lillie, 569
S.W.2d 501, 504 (Tex. Civ. App.–Tyler 1978, writ ref’d n.r.e.) (op. on reh’g).  Therefore, the only question for review is
whether evidence that repair costs will exceed the fair market value of the
property to be repaired constitutes legally sufficient evidence of a total
loss.[3]

Standard of
Review

            Whether property is a “total loss”
is a question of fact.  See Crutchfield
v. St. Paul Fire & Marine Ins. Co., 306 S.W.2d 948, 951 (Tex. Civ.
App.–Fort Worth 1957, no writ) (addressing the issue of total loss as a
question of fact).  When we review a
legal sufficiency challenge to written findings of fact, the standard of review
is the same as that applied to a jury’s verdict upon jury questions.  Catalina v. Blasdel, 881 S.W.2d
295, 297 (Tex. 1994).  As stated above,
when reviewing a finding of fact for legal sufficiency, we may set aside a
finding of fact only if the evidence at trial would not enable a reasonable and
fair minded finder of fact to reach the finding under review.  See City of Keller, 168 S.W.3d
at 827.  In making this determination, we
must credit favorable evidence if a reasonable finder of fact could, and disregard
contrary evidence unless a reasonable finder of fact could not.  See id.  

Discussion








            Property is a total loss if a
reasonably prudent uninsured owner, desiring to restore the property to its
preincident condition, would not utilize that property for such
restoration.  See State Farm Fire
& Cas. Co. v. Mower, 917 S.W.2d 2, 4 (Tex. 1995); Glen Falls
Ins. Co. v. Peters, 386 S.W.2d 529, 531 (Tex. 1965); Royal Ins.
Co. v. McIntyre, 90 Tex. 170, 182, 37 S.W. 1068, 1074 (1896).  Logic dictates that, absent other factors, a
reasonably prudent uninsured owner would not repair a vehicle where the repair
costs exceeded the vehicle’s preincident fair market value.  

            Here, the trial court made findings
of fact that the cost of repairing the tractor and trailer exceeded the fair
market value of those items.  In
contrast, there was evidence at trial that showed Mullinax wanted to retain
title to the tractor and trailer and that he hoped to repair them.  However, absent any specifics as to why
Mullinax thought such a course to be prudent, and in the context of the excessive
cost to repair, the trial court was free to disregard this evidence as an
unreasonable idea that would not comport with the ideas of a reasonable
uninsured owner. See City of Keller, 168 S.W.3d at 827.  We note that Canal employee Ron King
testified that he did not pay a claim of total loss because he does not
consider a vehicle that can be repaired to be a total loss.  Nonetheless, King’s personal definition of
total loss was irrelevant because it did not comport with the definition of
total loss that has been consistently applied by the Texas Supreme Court. See
Mower, 917 S.W.2d at 4; Peters, 386 S.W.2d at 531; McIntyre,
90 Tex. at 182, 37 S.W. at 1074. 
Therefore, because the trial court’s findings of fact relating to fair
market value and repair cost have not been challenged, we conclude that the
evidence of fair market values and costs to repair was sufficient evidence to
enable a reasonable and fair minded finder of fact to find that the tractor and
trailer were a total loss.  Thus, the
evidence was legally sufficient to support the finding.  See City of Keller, 168 S.W.3d
at 827.  We overrule Canal’s second
issue.

 

Lien

            In its third issue, Canal argues
that the Texas Occupations Code does not create a lien against insurance
settlement funds.  A review of the record
shows that the trial court’s judgment was not based upon a conclusion that the
Occupations Code created any such lien. 
We overrule Canal’s third issue.

 

Statutory Interpretation








            In its fourth issue, Canal claims
that the trial court erroneously interpreted section 2303.156(b) of the Texas
Occupations Code.  In its fifth and sixth
issues, Canal claims that section 2303.156(b) is unconstitutionally vague.

Standard of
Review & Method of Interpretation

            The interpretation of a statute is a
question of law.  In re Canales,
52 S.W.3d 698, 701 (Tex. 2001) (orig. proceeding).  Therefore, we review a trial court’s
interpretation of a statute de novo.  See
Smith v. Smith, 22 S.W.3d 140, 149 (Tex. App.–Houston [14th Dist.]
2000, no pet.).  When performing a de
novo review, we exercise our own judgment and redetermine each legal
issue.  Quick v. City of Austin,
7 S.W.3d 109, 116 (Tex. 1999).  We will
uphold conclusions of law on appeal if the judgment can be sustained on any
legal theory the evidence supports.  Waggoner
v. Morrow, 932 S.W.2d 627, 631 (Tex. App.–Houston [14th Dist.] 1996, no
writ).

            The Texas Code Construction Act
governs the interpretation of “each code enacted by the 60th or a subsequent
legislature as part of the state’s continuing statutory revision program.”  Tex.
Gov’t Code Ann. § 311.002(1) (Vernon 2005).  Section 2303.156(b) is part of such a
code.  See Tex. Occ. Code
Ann. § 1.001 (Vernon 2004). 
Therefore, we must apply the methods of interpretation set forth in the
Code Construction Act to section 2303.156(b). 
See Tex. Gov’t Code Ann. §
311.002(1).

            The
fundamental rule governing the construction of a statute is to ascertain the
intent of the legislature in enacting the statute.  Brown v. Owens, 674 S.W.2d 748,
750 (Tex. 1984).  Under the Code
Construction Act, when interpreting a statute, we must begin with the
presumption that the legislature intended that the statute (1) comply with the
United States and Texas constitutions, (2) be effective in its entirety, (3)
produce a “just and reasonable result,” and (4) produce “a result feasible
of execution.”  See Tex. Gov’t Code Ann. § 311.021 (Vernon
2005).  Likewise, we must also presume
that the legislature, “[i]n enacting [the] statute,” favored “public interest .
. . over any private interest.”  See id.  

            Under the Act, when “construing a
statute . . . a court may consider[,] among other matters[,] the:

 

(1)
object sought to be attained;

(2)
circumstances under which the statute was enacted;

(3)
legislative history;

(4)
common law or former statutory provisions, including laws on the same or
similar subjects;








(5)
consequences of a particular construction;

(6)
administrative construction of the statute; and

(7)
title (caption), preamble, and emergency provision.

 

Tex. Gov’t Code Ann. § 311.023 (Vernon 2005).  Consideration of these matters is appropriate
even where a statute is not considered ambiguous on its face.  Id.; Fleming Foods of
Tex., Inc. v. Rylander, 6 S.W.3d 278, 283 (Tex. 1999).  “Words and phrases shall be read in context
and construed according to the rules of grammar and common usage.”  Tex.
Gov’t Code Ann. § 311.011(a) (Vernon 2005).  However, where “[w]ords and phrases . . . have
acquired a technical or particular meaning, whether by legislative definition
or otherwise, [they] shall be construed accordingly.”  Tex.
Gov’t Code Ann. § 311.011(b) (Vernon 2005). 

            While we must apply the Act’s
presumptions regarding legislative intent, see Tex. Gov’t Code Ann. § 311.021, we are free to hold, where
appropriate, that those presumptions have been rebutted. Cf. Phoenix
Founders, Inc. v. Marshall, 887 S.W.2d 831, 835 (Tex. 1994) (orig.
proceeding) (holding that a presumption of unethical conduct could be
rebutted).  Also, while we may consider
matters such as legislative history, “[w]e must construe statutes as written
and, if possible, ascertain legislative intent from the statute’s language.”  Helena Chem. Co. v. Wilkins, 47
S.W.3d 486, 493 (Tex. 2001).  Finally, “we
must always consider the statute as a whole rather than its isolated
provisions.” Id. 

 

When
statutes are subject to construction, it is not within the judicial province to
indulge in acts of legislation.  Courts
may direct the attention of the lawmakers to a defect or omission in a statute,
but they must take the statutes as they find them.  It is for the legislature, not the courts, to
remedy defects or supply deficiencies in laws, and to give relief from unjust
and unwise legislation.  Accordingly, a
court is not authorized, under any pretext, to modify, repeal, or rewrite[] a
statute or even to construe an unambiguous act to conform to its own notions of
justice, policy, propriety, or wisdom.

 

67 Tex. Jur. 3d Statutes § 85
(2003) (internal citations omitted). 

Interpretation
of Section 2303.156(b)

            Section 2303.156(b) reads as
follows:

An
insurance company that pays a claim of total loss on a vehicle in a vehicle
storage facility is liable to the operator of the facility for any money owed
to the operator in relation to delivery of the vehicle to or storage of the
vehicle in the facility regardless of whether an amount accrued before the
insurance company paid the claim.

 








Tex. Occ. Code Ann. § 2303.156(b).  Canal claims that the legislative history of
section 2303.156 shows the legislature intended that section to be interpreted
in a manner that would impose monetary liability upon an insurer only where
there has been a post-tow transfer of title of the towed vehicle to the
insurer.  Canal buttresses this argument
by asserting that sections of the Texas Administrative Code support such an
interpretation.  Canal also argues that
the trial court interpreted the phrase “total loss” in a way unintended by the
legislature, alleging that the legislative history shows the legislature
considered the phrase “total loss” to mean a vehicle that was “without value.”  Finally, Canal asserts that the legislature
intended section 2303.156(b) to apply only where an insurance company “abandons”
a vehicle and “the facility operator is left to his own resources to collect
the costs incurred.” 

            Transfer of Title

            Section 2303.156(b) clearly and
unambiguously renders an insurance company liable for towing fees to the
operator of a vehicle storage facility regarding vehicles for which the
insurance company has paid a claim of total loss.  See id.  The statute does not exempt insurance
companies that have, for whatever reason, failed to obtain title to the
vehicle.  See id.  Nonetheless, Canal claims that the
statute’s legislative history supports the proposition that such an exemption
was intended.  We disagree.  While the legislative history contains some
supporting language, the unambiguous language of the statute contradicts that
language.  Further, no provision of the
Texas Administrative Code cited by Canal, in either the then existing or the
current version, directly relates to the question of insurance company
liability addressed by section 2303.156(b). 
See 43 Tex. Admin. Code. §§ 18.87,
18.90, 18.92, 18.96 (West, Westlaw, current through the date of this opinion)
(Tex. Dep’t of Transp., Vehicle Storage Facilities).[4]

            The most clear support for
Canal’s proposition can be found in the following statement made by Senator
Jerry Patterson:

                                

House Bill 2516 allows vehicle storage facilities to
be compensated for their towing and storage fees, if a vehicle is totaled. . .
. This will allow, after the title has been transferred to the insurance
company, the towing and storage lot folks to be reimbursed by the insurance
company for their towing and storage fees.

 








Hearing on Tex.
H.B. 2516 Before the Senate Comm. on Jurisprudence, 74th Leg., R.S., p. 11 of
Ex. C to Canal’s Brief (May 23, 1995) (transcript available from Legislative
Intent Research, Austin, Texas) (emphasis added).  However, neither the full House or Senate
ever discussed this issue.  Therefore, it
is impossible to fully discern the intent of the legislature as a whole.  Instead, we are presented with a statement
one senator made in committee.  Even if
the Senate committee considering section 2303.156(b) meant for the statute to
apply only “after the title has been transferred to the insurance company,” we
are still faced with the question whether the full Senate also had such an
intent.  This question is better answered
by unambiguous statutory language rather than legislative history.  See Fleming Foods, 6 S.W.3d at
284 (“[L]egislative history cannot be used to alter or disregard the express
terms of a code provision when its meaning is clear from the code when
considered in its entirety, unless there is an error such as a typographical
one.”).

            It is a cardinal rule of statutory
construction that we are to give effect to the intent of the legislature.  Id.  But isolated statements by individual
legislators must be weighed against the clear language used in section 2303.156(b).  See id. 
This unambiguous statute is the law of Texas and should not be
construed by this court to mean something other than what the plain words say
absent an obvious error, such as a typographical one resulting in the omission
of a word, or where application of its literal language would produce an absurd
result.  See id.  “Courts are not responsible . . . for
omissions in legislation, but only for giving a true and fair interpretation of
the enactment as it is written, which means an interpretation that is not
exaggerated, forced, or strained but one the ordinary meaning of the words of
the enactment will fairly sanction and clearly sustain.” 

Comm’rs Ct. of
Caldwell County v. Crim. Dist. Att’y, Caldwell County, 690 S.W.2d
932, 936 (Tex. App.–Austin1985, writ ref’d n.r.e.) (citing R.R. Comm’n of
Tex. v. Miller, 434 S.W.2d 670, 672 (Tex. 1968)).  Instead, “every word excluded from a statute
must . . . be presumed to have been excluded for a purpose.”  Sw. Bell Tel. Co. v. Pub. Util. Comm'n
of Tex., 79 S.W.3d 226, 229 (Tex. App.–Austin 2002, no pet.) (quoting Cameron
v. Terrell & Garrett, Inc., 618 S.W.2d 535, 540 (Tex. 1981)).  Because we have discerned no obvious textual
mistake, we cannot hold that the trial court erred by concluding that section
2303.156(b)
was not limited to instances where “title has been transferred to the insurance
company.”  Further, while the trial court’s
interpretation of this statute may be considered unwise by Canal, the result of
that interpretation, which follows the statute’s plain text, was not “absurd.”

            Total Loss








            Section 2303.156(b) applies to
instances where “[a]n insurance company . . . pays a claim of total loss on a
vehicle.”  According to Canal, the
legislative history shows that the legislature intended the phrase “total loss”
to apply only “in such cases where the vehicle is without value.”  Again, we disagree.  On the whole, the legislative history
reflects a concern by legislators regarding whether the interest acquired under
section 2303.156(b) would be superior to the interest possessed by secured
lenders.  See, e.g., Debate
on Tex. H.B. 2516 on the Floor of the House, 74th Leg., R.S., p. 10 of Ex. C to
Canal’s Brief (May 10, 1995) (transcript available from Legislative Intent
Research, Austin, Texas) (“KING: Does that . . . essentially mean that a
storage facility has a superior lien to the bank?”).  The fact that a major consideration of the
legislature was about who would have a superior interest in the affected
vehicles shows that the legislature was, as a whole, unlikely to be under the
impression that these vehicles would be “without value.”  Instead, the legislative history shows that
they considered the phrase “total loss” to be consistent with the word “totaled.”  See Hearing on Tex. H.B. 2516 Before
the Senate Comm. on Jurisprudence, 74th Leg., R.S., p. 11 of Ex. C to Canal’s
Brief (May 23, 1995) (“House Bill 2516 allows vehicle storage facilities to be
compensated for their towing and storage fees, if a vehicle is totaled.  Essentially, the problem arises when a
vehicle is . . . determined to be a total loss . . . .” (emphasis
added)).  

            It is commonly understood that “totaled”
vehicles are those for which repairs would be too costly compared to the value
of the vehicle.  See, e.g.,
Evans v. State, No. 03-01-00013-CR, 2001 WL 838189, at *3 n. 3 (Tex.
App.–Austin July 26, 2001, no pet.) (not designated for publication).  This comports with the Texas Supreme Court’s
definition of “total loss.”  See Mower, 917 S.W.2d
at 4; Peters, 386 S.W.2d at 531; McIntyre, 90 Tex.
at 182, 37 S.W. at 1074.  As stated
above, a “total loss” has been defined by the Texas Supreme Court to
occur in situations where a reasonably prudent uninsured owner, desiring to restore the
property to its preincident condition, would not utilize that property for such
restoration.  Generally, a reasonably
prudent uninsured owner would not repair a vehicle where the repair costs
exceeded the vehicle’s preincident fair market value.  Therefore, a “totaled” vehicle would
also be a “total loss.”








            Unless a contrary intent is clearly shown,
the legislature is presumed to have enacted new or revised statutes with
knowledge of the existing state of the law and with the intent that the new law
be subject to the old.  Twin City
Fire Ins. Co. v. Cortez, 576 S.W.2d 786, 789 (Tex. 1978).  The Texas Supreme Court has consistently
defined and interpreted the term “total loss”for over 100 years.  See, e.g., Mower,
917 S.W.2d at 4; Peters, 386 S.W.2d at 531; McIntyre,
90 Tex. at 182, 37 S.W. at 1074.  This
definition does not require that the property be without value; it merely
requires that a reasonably prudent uninsured owner, desiring to restore the
property to its preincident condition, would not utilize that property for such
restoration.  See id.  Further, such a definition also comports with
the word “totaled.”  Bearing in mind this
consistent definition of “total loss” and the presumption that the legislature
enacted section 2303.156(b) with the intent that it be subject to older law
(here, the consistent definition of “total loss”), we hold that, under section
2303.156(b), a “total loss” occurs whenever the repair costs of a vehicle
exceed the vehicle’s preincident fair market value.  The trial court concluded that “Mullinax’s
truck and trailer were a ‘total loss’ because the cost of repair of the damages
to them was equal to, or in excess of, their fair market value at the time of
the loss.”  The trial court did not err
in its interpretation of “total loss.”

            Abandonment

            Finally, Canal asserts that the legislature
intended section 2303.156(b) to apply only to situations where an insurance
company “abandons” a vehicle and “the facility operator is left to his own
resources to collect the costs incurred.” 
The statute in question contains no language requiring that an insurance
company actually abandon a vehicle. 
Further, the legislative history supports a slightly different intent:

 

[S]ometimes
[vehicle owners] just abandon the vehicles and [the storage facility does not]
have room for anything else and nobody ever claims [the vehicle].  That’s what [section 2303.156(b)] is intended
to address.

 

Debate on Tex.
H.B. 2516 on the Floor of the House, 74th Leg., R.S., p. 9 of Ex. C to Canal’s
Brief (May 10, 1995).

 

Essentially,
the problem arises when a vehicle is . . . a total loss, but has been towed and
. . . stowed by [a storage] facility . . . and then no one comes to get it . .
. neither the owner nor the insurance company.

 

Hearing on Tex.
H.B. 2516 Before the Senate Comm. on Jurisprudence, 74th Leg., R.S., p. 11 of
Ex. C to Canal’s Brief (May 23, 1995).








            Here, Canal paid “a claim of total loss.”  Neither Mullinax, the owner, or Canal, the
insurer, “[came] to get” the vehicles in question.  Hopkins was, thus, faced with the proposition
of never receiving payment for the towing charges related to the vehicles.  The legislative history supports the
conclusion that this was the exact factual situation that the statute in
question was enacted to remedy. 
Therefore, we hold that the trial court did not err by concluding that “Canal
[could be held] liable . . . to pay [Hopkins’s] charges for towing Mullinax’s
truck and trailer.”

Vagueness

            In its fifth issue, Canal asserts
that section 2303.156(b) of the Texas Occupations Code is unconstitutionally
vague because the statute does not define the term “total loss.”  In its sixth issue, Canal argues that section
2303.156(b) of the Texas Occupations Code is unconstitutionally vague because
it does not contain language restricting the liability of an insurer to
instances where there has been a post-tow transfer of title to the towed
vehicle from the insured to the insurer.

            A statute is unconstitutionally
vague if the persons regulated by it are exposed to risk or detriment without
fair warning or if it invites arbitrary and discriminatory enforcement.  See
Comm'n for Lawyer Discipline v. Benton, 980 S.W.2d 425, 437 (Tex.
1998).  We scrutinize civil statutes less
severely than criminal statutes because the consequences of imprecision are not
as severe.  See Village of Hoffman
Estates, Inc. v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99,
102 S. Ct. 1186, 1193, 71 L. Ed. 2d 362 (1982). 
A statute is not unconstitutionally vague unless it would require people
of common intelligence to guess at its meaning or there is a substantial risk
of miscalculation by those whose acts are subjected to regulation.  See Tex. Liquor Control Bd. v. Attic
Club, Inc., 457 S.W.2d 41, 45 (Tex. 1970).

            Total Loss








            “[T]he mere fact that the parties
disagree as to [the statute’s] meaning does not mean we must necessarily guess
at its meaning.” Mills v. Fletcher, 229 S.W.3d 765, 770 (Tex.
App.–San Antonio 2007, no pet.).  Once
again, unless a contrary intent is clearly shown, the legislature is presumed
to have enacted new or revised statutes with knowledge of the existing state of
the law and with the intent that the new law be subject to the old.  Twin City Fire Ins., 576 S.W.2d
at 789.  The Texas Supreme Court has
consistently defined and interpreted the term “total loss”for over 100
years.  See, e.g., Mower,
917 S.W.2d at 4; Peters, 386 S.W.2d at 531; McIntyre,
90 Tex. at 182, 37 S.W. at 1074.  Bearing
in mind this consistent definition of “total loss” and the presumption that the
legislature enacted section 2303.156(b) with the intent that it be subject to
older law (here, the consistent definition of “total loss”), we determine
that  people of common intelligence would
not be required to guess at the meaning of the statute and that there is not a
substantial risk of miscalculation by those whose acts are subjected to
regulation.  Therefore, we hold that the
phrase “total loss” found in section 2303.156(b) is not unconstitutionally
vague.  See Attic Club, 457
S.W.2d at 45.

            Transfer of Title

            Section 2303.156(b) clearly and
unambiguously renders an insurance company liable, for towing fees, to the
operator of a vehicle storage facility, regarding vehicles for which the
insurance company has paid a claim of total loss.  See Tex.
Occ. Code Ann. § 2303.156(b).  The
statute does not exempt insurance companies who have, for whatever reason,
failed to obtain title to the vehicle.  See
id.  Therefore, we cannot hold
that the omission of Canal’s proposed requirement makes the statute
unconstitutionally vague.  Because people
of common intelligence would not be required to guess at the meaning of this
statute, and because there is not a substantial risk of miscalculation by those
whose acts are regulated by it, we hold that section 2303.156(b) is not
unconstitutionally vague.  See
Attic Club, 457 S.W.2d at 45.

Conclusion

            Having determined that the trial
court did not err in its interpretation of section 2303.156(b), we overrule
Canal’s fourth issue.  Because we have
determined that section 2303.156(b) is not unconstitutionally vague, we
overrule Canal’s fifth and sixth issues.

 

Impairment of Contractual Obligations

            In its seventh
issue, Canal complains that the trial court’s interpretation of section
2303.156(b) is unconstitutional under the Contracts Clause found in article I,
section 10 of the United States Constitution. 
In pertinent part, article I, section 10 provides that “[n]o State
shall . . . pass any . . . Law impairing the
Obligation of Contracts . . . .” U.S.
Const. art I, § 10, cl. 1.  The
constitutionality of a trial court’s interpretation of a statute is a question
of law.  See Griggs v. State,
99 S.W.3d 718, 721 (Tex. App.–Houston [1st Dist.] 2003, pet. ref’d).  Therefore, we will conduct our review de
novo.  See Smith, 22 S.W.3d
at 149.

            Canal claims that the trial court's
interpretation of section 2303.156(b) is, in and of itself, an 

 

 

 

 

 








unconstitutional
impairment of Canal's insurance contract obligations.[5]  Therefore, the question before us is whether
a judicial interpretation of a statute can constitute, in and of itself, law
impairing the obligation of a contract.[6] 
This question must be answered in the negative.

            The Contracts Clause of article I,
section 10 is directed only against impairment by legislation, and not against
the judgments of courts.  Barrows
v. Jackson, 346 U.S. 249, 260, 73 S. Ct. 1031, 1037, 97 L.
Ed. 1586 (1953); Fleming v. Fleming, 264 U.S. 29, 31-32, 44 S.
Ct. 246, 247, 68 L. Ed. 547 (1924); see U.S. Const. art I, § 10, cl. 1.  Therefore, as a matter of law, the trial
court’s interpretation of section 2303.156(b) could not violate the Contracts
Clause.  See id.  We overrule Canal’s seventh issue.








Taking of Property

            In its eighth and ninth issues,
Canal argues that section 2303.156(b), as applied, resulted in the
unconstitutional taking of money from Canal and the awarding of that money to
Hopkins in violation of the takings protections found in the Fifth Amendment to
the United States Constitution and article I, section 17 of the Texas
Constitution.  The money addressed here
is the amount necessary to satisfy the trial court’s judgment against Canal for
the towing fees in question. 

Standard of
Review

            The determination of whether a
statute violates a constitution is a question of law, and thus is reviewed de
novo.  See State v. Operating
Contractors, 985 S.W.2d 646, 650-51 (Tex. App.–Austin 1999, pet.
denied).

Federal
Takings Claim

            The Takings Clause of the Fifth
Amendment to the United States Constitution provides that “private property
[shall not] be taken for public use, without just compensation.”  U.S.
Const. amd. V.  The clause “was
designed to bar Government from forcing some people alone to bear public
burdens which, in all fairness and justice, should be borne by the public as a
whole.”  Armstrong v. United States,
364 U.S. 40, 49, 80 S. Ct. 1563, 1569, 4 L. Ed. 2d 1554 (1960).  It was made applicable to state governments
by the Fourteenth Amendment.  Penn
Cent. Transp. Co. v. City of New York, 438 U.S. 104, 122, 98 S. Ct.
2646, 2658, 57 L. Ed. 2d 631 (1978).  It
protects not only persons, but corporations as well.  See, e.g., E. Enters. v.
Apfel, 524 U.S. 498, 538, 118 S. Ct. 2131, 2153, 141 L. Ed. 2d 451
(1998) (plurality op.) (holding that an unconstitutional taking of a
corporation’s property had occurred).

            The Takings Clause is concerned with
government taking of “private property.” 
See U.S. Const. amd. V.  Therefore, we begin our inquiry with two
questions: (1) is the item in question “property” and, (2) if it is property,
is it “private property.”  See id.  “Property interests . . . are not
created by the Constitution.”  Bd.
of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed.
2d 548 (1972).  Instead, they are
created, and their dimensions are defined, by existing rules or understandings
that stem from an independent source, such as state law.  Id.








            Money is “property”
under Texas law.  See Norris v.
City of Waco, 57 Tex. 635, 643 (1882).  Further, it is uncontested that the money
awarded Hopkins under the judgment in question was Canal’s money and that Canal
is not a public entity.  Therefore, we
conclude that the money awarded to Hopkins was Canal’s “private property”
within the meaning of the Takings Clause. 
See Roth, 408 U.S. at 577, 92 S. Ct. at 2709.  As such, we must now determine if the money
was “taken” within the meaning of the Clause. 
See, e.g., Ruckelshaus v. Monsanto Co., 467
U.S. 986, 1004, 104 S. Ct. 2862, 2873-74, 81 L. Ed. 2d 815 (1984).

            The question whether property has
been “taken” is “essentially [an] ad hoc, factual inquir[y].” Penn Cent.
Transp., 438 U.S. at 124, 98 S. Ct. at 2659.  In the context of a law such as section
2303.156(b), we must consider the three factors set forth in Penn Central
Transportation Company v. City of New York.  See Lingle v. Chevron U.S.A. Inc.,
544 U.S. 528, 537-38, 125 S. Ct. 2074, 2081, 161 L. Ed. 2d 876 (2005).  According to Penn Central, when
determining if a taking has occurred, we should consider (1) “the economic
impact of the [law] on the claimant”; (2) “the extent to which the [law] has
interfered with distinct investment-backed expectations”; and (3) “the
character of the governmental action.”  See
Penn Cent. Transp., 438 U.S. at 124, 98 S. Ct. at 2659. 

            Penn Central “provides
important guideposts that lead to the ultimate determination [of] whether just
compensation is required.”  Sheffield
Dev. Co. v. City of Glenn Heights, 140 S.W.3d 660, 672 (Tex. 2004)
(quoting Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg’l Planning Agency,
535 U.S. 302, 326-27 n.23, 122 S. Ct. 1465, 1481 n.23, 152 L. Ed. 2d 517
(2002)).  Nonetheless, “these factors do
not comprise a formulaic test.”  Sheffield
Dev., 140 S.W.3d at 672.  Instead,
these factors “aim[] to identify [government] actions that are functionally
equivalent to the classic taking in which government directly appropriates
private [real] property or ousts the owner from his domain.”  Lingle, 544 U.S. at 539, 125 S.
Ct. at 2082.  Finally, in some instances,
the force of one of the Penn Central factors may be so
overwhelming that it is dispositive of whether a taking has occurred.  See, e.g., Ruckelshaus,
467 U.S. at 1005, 104 S. Ct. at 2874. 

            Economic Impact

            According to Canal,

[t]he
economic impact on Canal . . . is substantial. 
Canal[] is an insurance company that currently does not write . . .
coverage for towing or storage.  The
trial court’s application of [section 2303.156(b)] demands that Canal pay
towing and storage costs for each of the vehicles it insures while not
collecting any premium as compensation. 
This is an unconscionable result . . . .

 








We note that
Canal has not addressed the number of vehicles for which Canal pays a claim of
total loss yearly, how many of those vehicles fall within the grasp of Texas
law, or the actual cost Canal would incur yearly as a result.  The only economic impact that can be
quantified is the amount awarded to Hopkins in the judgment in question,
$12,690.00, plus prejudgment interest and court costs.  However, we will assume, arguendo, that the
economic impact upon Canal, a nationwide insurer of commercial carriers, is “substantial.”

            Investment-Backed Expectations

            We now turn to “the extent to which
[section 2303.156(b)] has interfered with distinct investment-backed
expectations.”  See Penn Cent.
Transp., 438 U.S. at 124, 98 S. Ct. at 2659.  When considering this factor, we must
determine if the expectations in question were reasonable. See Ruckelshaus,
467 U.S. at 1005, 104 S. Ct. at 2874.  In
this regard, a “reasonable investment-backed expectation” must be more than a “unilateral
expectation or an abstract need.”

Id.

            Canal argues that

 

Canal,
like all private companies and individuals, relies heavily on constitutionally
guaranteed notions of liberty, protection of personal property, and freedom of
contract.  Here, Canal’s reliance that it
could enter into a contractual relationship clearly defining its obligations
regarding insurance coverage for vehicles without interference from the State
or a third party was reasonable.  The
trial [c]ourt’s ruling, however, results in the State . . . actually depriving
Canal of its property.

 

In short,
Canal argues it had a reasonable investment backed expectation that has been
fully interfered with by government.

            In the course of regulating
commercial and other human affairs, legislatures routinely create burdens for
some that directly benefit others.  See,
e.g., E. Enters., 524 U.S. at 526, 118 S. Ct. at
2148.  In this regard, “legislation is
not unlawful solely because it upsets otherwise settled expectations.” Id.  Therefore, we must evaluate the
reasonableness of Canal’s expectations in the context of the industry in which
it operates.  See Ruckelshaus,
467 U.S. at 1005, 104 S. Ct. at 2874. 








            The “insurance [industry] affects a
great many people, is subject to substantial governmental regulation[,] and is
stamped with a public interest.”  Eckenrode
v. Life of Am. Ins. Co., 470 F.2d 1, 5 (7th Cir. 1972); see Linick
v. Employers Mut. Cas. Co., 822 S.W.2d 297, 299-300 (Tex. App.–San
Antonio 1991, no writ).  The organization
of an insurance company and the conduct of the business of writing insurance is
not a right but a privilege granted by the states, subject to the conditions
imposed by the states.  See Blue
Cross & Blue Shield of Cent. N.Y., Inc. v. McCall, 674 N.E.2d 1124,
1126 (N.Y. 1996); see also German Alliance Ins. Co. v. Lewis, 233
U.S. 389, 411-14, 34 S. Ct. 612, 618-20, 58 L. Ed. 1011 (1914).  Indeed, the states have a long history of
regulating the insurance industry.  See,
e.g., Linick, 822 S.W.2d at 299-300.  One need only peruse the Texas Insurance Code
to understand the pervasiveness of insurance regulation in the United States.

            In Ruckelshaus v.
Monsanto Company, the United States Supreme Court addressed a situation
involving another heavily regulated industry, the pesticide industry.  The regulations in question involved the
statutorily allowed disclosure of confidential information submitted by
pesticide companies to the federal Environmental Protection Agency (EPA).  Ruckelshaus, 467 U.S. at 1000,
104 S. Ct. at 2871.  According to the
Court, the pesticide industry had “long been the source of public concern and
the subject of government regulation.”  Id.,
467 U.S. at 1007, 104 S. Ct. at 2875. 
The Court reasoned that “[b]ecause the market for Monsanto’s pesticide
products is an international one, Monsanto could decide to forgo registration
in the United States and sell a pesticide only in [overseas] markets.”  Id., 467 U.S. at 1007 n.11, 104
S. Ct. at 2875 n.11.  Further, the Court
reasoned “[t]hat Monsanto is willing to bear this burden [of disclosure] in
exchange for the ability to market pesticides in this country is evidenced by
the fact that it has continued to expand its research and development and to
submit data to EPA despite . . .” the regulations regarding disclosure.  Id., 467 U.S. at
1007, 104 S. Ct. at 2875.  After
evaluating the reasonableness of Monsanto’s expectations, within the context of
the pesticide industry, the Court held that no taking had occurred.  Id., 467 U.S. at 1005-07, 104
S. Ct. at 2874-75.  In short, because
Monsanto had subjected itself to the regulations by choosing to be part of the
industry, its expectations of avoiding the regulations were not reasonable.








            Here, although part of the
Occupations Code, section 2303.156(b) is clearly an insurance regulation.  See Tex.
Occ. Code Ann. § 2303.156(b).  Its
aim is to shift the burden associated with the towing of totaled vehicles from
towing companies to insurance companies. 
This increases the likelihood that towing companies will be willing to
tow wrecked vehicles from public roadways. 
The trial court made a finding of fact that “public safety is affected
by the presence of a wrecked vehicle on or near a public highway.”  Because this finding of fact has not been
challenged, we accept it as a proven fact. 
See Lovejoy, 569 S.W.2d at 504.  Further, the trial court concluded that  this risk to public safety provided a
rational basis for the enactment of section 2303.156(b).  We agree that this risk to public safety
provided a rational basis for the pertinent legislation.  See Exxon Corp. v. Governor of Md.,
437 U.S. 117, 124-25, 98 S. Ct. 2207, 2213, 57 L. Ed. 2d 91 (1978).

            According to Canal’s representative,
Ron King, Canal issued insurance to commercial carriers from “coast to coast,”
focusing on “over-the-road tractor-trailers . . . long-haul type trucks.”  “[I]n the course of the week of traveling[,
these vehicles] may cross several states.” 
King admitted that “the laws of each state are not exactly the same.”  Therefore, as a company insuring “thousands”
of trucks and trailers across the country, Canal would “have to recognize in
one state [that it] may be dealing [with] a different situation in terms of
what [it] can or can’t do in another state.”

            According to Canal, “[it]
understands that it must comply with Texas law. 
Canal has never argued that the laws of the state should not be properly
applied.”  Nonetheless, Canal argues that
it relied upon “constitutionally guaranteed notions of liberty, protection of
personal property, and freedom of contract.” 
Therefore, Canal argues that it had a reasonable expectation of avoiding
section 2303.156(b).  We disagree.

            Canal was operating in an industry
that “affects a great many people, is subject to substantial governmental regulation[,]
and is stamped with a public interest.”  See
Eckenrode, 470 F.2d at 5.  By
operating as a nationwide insurance company, Canal was enjoying a privilege
granted by the states, subject to the conditions imposed by the states.  See McCall, 674 N.E.2d at 1126;
see also  German Alliance Ins.,
233 U.S. at 411-14, 34 S. Ct. at 618-20. 
In
the specific context of section 2303.156(b), Canal, a foreign corporation,
could have chosen to issue insurance policies only to foreign commercial
carriers who did not have routes going into or through Texas, thereby avoiding
the statute.[7]  Because Canal did not do
so, we may conclude that Canal was willing to bear the burdens of Texas law in
exchange for the ability to market insurance on a large scale.  See Ruckelshaus, 467 U.S. at
1007, 104 S. Ct. at 2875.  As stated by
Canal, “Canal understands that it must comply with Texas law.  Canal has never argued that the laws of the
state should not be properly applied.”  








            Section 2303.156(b) was a rationally
based insurance regulation.   In light of the industry in question, its
history of regulation, and the strong public interest related to it, combined
with the fact that Canal had taken on the burdens of Texas law, we cannot
conclude that Canal had a reasonable expectation of avoiding section
2303.156(b).  See id.,
467 U.S. at 1005-07, 104 S. Ct. at 2874-75.  This factor weighs against a finding that a
taking occurred. See id.        

            Governmental Action

            We must now consider the character
of the governmental action in question.  See
Penn Cent. Transp., 438 U.S. at 124, 98 S. Ct. at 2659.  Canal asserts that

 

.
. . the . . . application of [section 2303.156(b)] require[d] the State of
Texas . . . to take possession of Canal’s property.  Such an outcome unquestionably results in the
government . . . physically invading and taking Canal’s personal property.  Therefore, the result imposed by the . . .
application of [section 2303.156(b)] satisfies the [third] factor of the Penn
Central test.

 

            Here, our analysis is informed by
the purpose of the Takings Clause, which is to bar government from forcing some
people alone to bear public burdens which, in all fairness and justice, should
be borne by the public as a whole.  See
Palazzolo v. Rhode Island, 533 U.S. 606, 616-18, 121 S. Ct. 2448,
2457-58, 150 L. Ed. 2d 592 (2001).  “A ‘taking’
may more readily be found when the interference with property can be
characterized as a physical invasion by government . . . than . . . [as a]
public program adjusting the benefits and burdens of economic life to promote
the common good.”  Penn Cent.
Transp., 438 U.S. at 124, 98 S. Ct. at 2659.  The United States Supreme Court “has
accordingly recognized, in a wide variety of contexts, that government may
execute laws or programs that adversely affect recognized economic values.” Id.

            Section 2303.156(b) can be
characterized more as a “public program adjusting the benefits and burdens of
economic life to promote the common good” than as a “physical invasion by
government.”  See Penn Cent.
Transp., 438 U.S. at 124, 98 S. Ct. at 2659.  As discussed above, section 2303.156(b) is a
rationally based statute governing insurance companies.  State insurance company regulations are part
of the burdens insurance companies must generally bear for the privilege of
doing business in the states.  As such,
this factor weighs against a taking.

            Weighing of the Factors








            Assuming that the impact upon Canal
was “substantial,” we must still hold that the application of section
2303.156(b) did not constitute a taking. 
First, as a company that sought out the privilege to conduct a
nationwide insurance business, Canal knowingly took on the burdens of the laws
of the states.  Second, section
2303.156(b) approximates closer to a “public program adjusting the benefits and
burdens of economic life to promote the common good” than to a “physical
invasion by government.” 
Therefore, we hold that  the
application of section 2303.156(b) to Canal was not a taking within the meaning of the
Takings Clause.  See Penn Cent.
Transp., 438 U.S. at 124, 98 S. Ct. at 2659.  As such, no violation of the Takings Clause
occurred.

State Takings
Claim

            Article I, section 17 of the Texas
Constitution provides that “[n]o person’s property shall be taken, damaged or
destroyed for or applied to public use without adequate compensation being
made.”  Tex.
Const. art I, § 17.  Canal
qualifies as a “person” for the purposes of our inquiry, see Mo.-Kan.-Tex.
R.R. Co. of Tex. v. Rockwall County Levee Improvement Dist. No. 3, 117
Tex. 34, 46, 297 S.W. 206, 210 (1927), and the money in question was Canal’s
property.  See Norris, 57
Tex. at 643.  Therefore, we must
determine whether Canal’s money was “taken . . . for . . . public use without
adequate compensation being made.” See Tex.
Const. art I, § 17. 

            Under Texas law, property is
generally understood to have been “taken” when it is acquired by the exercise
of eminent domain.  See State ex
rel. Pan Am. Prod. Co. v. Texas City, 157 Tex. 450, 453, 303 S.W.2d
780, 782 (1957) (“The constitutional inhibition against taking private property
for public use without compensation has reference solely to the exercise of the
right of eminent domain . . . .”); Winship v. City of
Corpus Christi, 373 S.W.2d 844, 848 (Tex. Civ. App.–Corpus Christi
1963, writ ref’d n.r.e.) (reiterating Pan Am. Prod.).  But see Rylander v. Palais Royal, Inc.,
81 S.W.3d 909, 915 (Tex. App.–Austin 2002, pet. denied) (“[State]
takings-clause claims are not absolutely limited to eminent domain . . . .”).  In this regard, the Texas Supreme Court has
distinguished between an unconstitutional taking of property and the mere
imposition of taxes. 

 

The
right of taxation, and the right of eminent domain, rest substantially upon the
same foundation.  Private property may be
constitutionally [acquired] for public use in two ways, that is to say, by
taxation, and by right of eminent domain. 
These are rights which the people collectively retain over the property
of individuals, to resume such portions of it as may be necessary for public
use. . . . Taxation operates upon a community, or upon a class of persons in
a community, and by [the] same rule of apportionment.  The exercise of the right of eminent domain
operates upon an individual, and without reference to the amount or value
exacted from any other individual or class of individuals. . . .

 

Norris, 57 Tex. at
643 (emphasis added).








            This difference between an eminent
domain taking and taxation has been further elaborated on by the Texas Supreme
Court in the context of what constitutes “adequate compensation.”  According to the court, eminent domain “takes
specific property . . . upon paying compensation therefor.”  City of Austin v. Nalle, 102 Tex.
536, 538, 120 S.W. 996, 996 (1909). 
Taxation acquires money, “the only compensation being that it will be
appropriated according to law.”  Id.;
see also Norris, 57 Tex. at 642-43.

            Section 2303.156(b) operates in a
manner more akin to a tax than the exercise of eminent domain.  The statute operates upon a class of persons
or entities (here, insurance companies), and by the same rule of apportionment
(all are required to pay the towing fees for vehicles on which they pay a claim
of total loss).  See Tex. Occ. Code Ann. § 2303.156(b).  Therefore, the operation of section
2303.156(b) upon Canal did not constitute a taking under Texas constitutional
law.  See Norris, 57 Tex.
at 643; see also Palais Royal, 81 S.W.3d at 915 (“The State has
the authority to levy and collect taxes in a rational and legitimate
manner.  The exercise of that authority
here does not amount to a taking.”).  As
such, no violation of the Texas Constitution occurred.  See id.

            Even if the operation of section
2303.156(b) upon Canal were a taking, the result would not change.  Because the statute operates in a manner more
akin to a tax than the exercise of eminent domain, the applicable definition of
“adequate compensation” would not require that Canal be reimbursed for the
taking.  Instead, the only compensation
afforded Canal would be the understanding that the money in question “will be
appropriated according to law.”  See Nalle,
102 Tex. at 538, 120 S.W. at 996.

Conclusion

            Having held that no taking occurred,
we overrule Canal’s eighth and ninth issues.

 

Due Process

            In its tenth
issue, Canal challenges the constitutionality of section 2303.156(b), arguing
that the statute, as applied, resulted in a violation of Canal’s procedural due
process rights under the United States Constitution. 








            Procedural due process ensures that
government decisions will be made with sufficient procedural safeguards.  See Mathews v. Eldridge,
424 U.S. 319, 332, 96 S. Ct. 893, 901, 47 L. Ed. 2d 18 (1976).  A fundamental requirement of due process in
any proceeding that is to be accorded finality is notice reasonably calculated,
under all the circumstances, to apprise interested parties of the pendency of
the action and afford them an opportunity to present their objections.  Armstrong v. Manzo, 380 U.S.
545, 550, 85 S. Ct. 1187, 1190, 14 L. Ed. 2d 62 (1965).  Another 
fundamental requirement of due process is the opportunity to be heard at
a meaningful time and in a meaningful manner. Id., 380 U.S. at
552, 85 S. Ct. at 1191.  The
determination of whether a statute acts in violation of constitutional due
process requirements is a question of law reviewed de novo.  See Operating Contractors,
985 S.W.2d at 650-51.

            Canal asserts that

 

[i]n
the present case, it is clear that Canal’s private interest has been infringed
upon with no procedural notice or opportunity to be heard.  Canal never owned the vehicles towed, never
received any notice that they were going to be towed until after it had already
happened, and only much later learned what had happened. . . . Canal [had] no
meaningful opportunity to explain its position - it never owned nor was it
responsible for the vehicles.  Canal
merely insured the two vehicles.

 

In short,
Canal argues that it was entitled to immediate notice of the wreck and the
possibility that the vehicles would be towed, along with the immediate
opportunity to urge that it was not responsible for the payment of towing
charges.  

            The deprivation in question occurred
when the trial court entered a money judgment against Canal.  Until that time, Canal had not been ordered
to pay any money.  See Cleveland
Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S. Ct. 1487, 1493,
84 L. Ed. 2d 494 (1985) (construing the deprivation of an employee’s property
interest in employment as occurring at the employee’s actual termination).  By the time the judgment was entered, Canal
had been served with Hopkins’s petition and, thus, put on notice of Hopkins’s
lawsuit against it.  This notice met the
requirements of due process.  See Mullane
v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S. Ct.
652, 657, 94 L. Ed. 865 (1950) (“Personal service of written notice within the
jurisdiction is the classic form of notice always adequate in any type of
proceeding.”).  Finally, Canal had a
meaningful opportunity to be heard: a full trial was held in which Canal was
given an opportunity to make legal arguments as well as put on relevant
evidence and cross examine the witnesses against it.  Nothing more was required. See Manzo,
380 U.S. at 552, 85 S. Ct. at 1191.  We
overrule Canal’s tenth issue.

 

 

 

Disposition

            We affirm the judgment
of the trial court.

                                                                                                     JAMES T. WORTHEN    

                                                                                                                 Chief Justice

Opinion delivered October 24,
2007.

Panel
consisted of Worthen, C.J., Griffith, J., and Hoyle, J.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

(PUBLISH)











[1] Both parties have
assumed that the trial court made an implied nonfinding of consent, and neither


addresses the nonfinding’s
omission from the trial court’s written findings of fact.  Absent any argument to the contrary, we will
imply, arguendo, such a nonfinding and decline to conduct any review of this
issue using the methodology set forth in Vickery v. Commission for Lawyer
Discipline, 5 S.W.3d 241, 253 (Tex. App.–Houston

[14th Dist.] 1999, pet. denied).





[2] Both Mullinax, who owned the tractor and trailer, and Sweeney, who was
the lessee of the tractor, fall within the Occupations Code definition of “owner.”
See Tex. Occ. Code Ann. § 2303.002(5)
(Vernon 2004).  Additionally, the tractor
and trailer each qualify as a “vehicle” under the Code. See Tex. Occ. Code Ann. § 2303.002(7)
(Vernon 2004).  Therefore, under the
express language of the Code, Sweeney could consent to the tow of the tractor
but not the trailer.  See id. § 2303.002(5).  We do not address whether Sweeney was
Mullinax’s agent.





[3] In
its motion for rehearing, Canal, for the first time, contests the trial court’s
finding of fact that the preincident fair market value of the tractor was
$10,000.  The sole purpose of a motion
for rehearing is to provide the appellate court an opportunity to correct any
errors on issues already presented. Phifer v. Nacogdoches County Cent.
Appraisal Dist., 45 S.W.3d 159, 166 (Tex. App.–Tyler 2000, pet.
denied).  A motion for rehearing does not
afford a party an opportunity to raise new issues. Id.  Therefore, we do not address this complaint.

 

                Canal’s
second issue is a “no evidence” issue, which, without further explanation,
could be construed to encompass a complaint about the basis of the trial court’s
$10,000 fact finding.  However, in the
briefing of its second issue, Canal did not attack any of the trial court’s
separate findings of fact underlying the trial court’s “total loss”
finding.  Instead, Canal argued that the
evidence, taken as a whole, had only one reasonable interpretation.  Under these circumstances, it would be
inappropriate to read a complaint as to the $10,000 finding into Canal’s second
issue.  Canal concedes as much by failing
to argue, in its motion for rehearing, that such a complaint was one of the
issues presented in its brief or reply brief. 
By failing to argue any connection to its original issues, Canal merely
seeks appellate review of a new and previously unpresented issue.  Such a review is beyond the scope of
rehearing. See id.





[4] For
simplicity, we have cited only the current version of these sections.





[5] Canal, in its brief, initially argued that
section 2303.156(b), as applied, unconstitutionally impaired the contractual
obligations of the insurance contract between it and Mullinax by requiring “Canal
to pay . . . insurance benefits to an unrelated [third] party claimant
(Hopkins) or [by] otherwise [requiring] Canal to make payments beyond the scope
of its insurance agreement with [Mullinax] and beyond its already exhausted
policy limits and without effective notice procedures.”  Hopkins responded, stating in his brief that

 

Canal’s argument that
its contract rights are constitutionally impaired by [section 2303.156(b)]
ignores the plain fact that[,] when it contracts to do business in Texas[,] it
agrees to operate under the laws of [Texas]. 
The State of Texas has adopted laws that were in force when Canal chose
to sell a policy of insurance to a truck owner and operator[, Mullinax,] who
transported goods in Texas.  What Canal
claims is that it should be able to issue a policy of insurance to an insured
who does business in Texas, but not be bound to comply with the laws of
[Texas].  Texas has long recognized the
rule that “[t]he laws . . . existing at the time a contract is made[] become
part of the contract.” (citations omitted).

 

            In
response to Hopkins, Canal, in its reply brief, refined its issue.  Canal stated

 

Hopkins brazenly
claims that Canal fails to recognize that it must operate under the laws of the
State of Texas.  Hopkins is
mistaken.  Canal understands that it must
comply with Texas law.  Canal has never
argued that the laws of the state should not be properly applied.

 

Canal went on to
explain that its assertion was that the trial court has incorrectly interpreted
section 2303.156(b).  According to Canal,
“[t]he plain fact is [that section 2303.156(b)] was not designed or intended
for a case like this.”  We, therefore,
have determined that Canal has not presented us with the question of section
2303.156(b)’s constitutionality under the Contracts Clause.  Instead, Canal has presented us with the
question of whether the trial court’s interpretation was, in and of itself, an
unconstitutional impairment of Canal’s insurance contract obligations.





[6] To the extent that Canal has mentioned any previously unconsidered
arguments as to possible errors made by the trial court in interpreting the
statute in question, Canal has either failed to provide citation to the record
or authority or failed to provide substantive argument.  Therefore, Canal has failed to present the
arguments for appellate review.  See Strange
v. Cont’l Cas. Co., 126 S.W.3d 676, 678 (Tex. App.–Dallas 2004, pet.
denied); see also Tex. R.
App.  P. 38.1(h).  Further, all of these arguments are
contradicted by either the facts of the case or by the unambiguous text of the
statute in question.  As such, even were
we to base our holding on the merits of these arguments, the result would not
change.





[7] As used here, the word “foreign” refers to non-Texas entities.